Filed 7/1/13

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

      Plaintiff and Respondent,

      v.

DANIEL NUNEZ and WILLIAM TUPUA SATELE,

      Defendants and Appellants.

)
)
)
)    S091915
)
)    Los Angeles County
)    Super. Ct. No. NA039358
)
)
)

_____

A jury convicted defendants Daniel Nunez and William Tupua Satele of the first degree murders of Renesha Ann Fuller and Edward Robinson. (Pen. Code,[1] §§ 187, subd. (a), 189.) The jury also found true special circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)), and sentence enhancement allegations that defendants committed the murders to benefit a criminal street gang and used firearms to commit them. (§§ 186.22, subd. (b)(1), 12022.53, subd. (d).) Special circumstance allegations that defendants intentionally killed the victims because of their race (§ 190.2, subd. (a)(16)) were found not true, as were enhancement allegations that defendants committed the murders in concert because of the victims' race (§ 422.75, former subd. (c), now subd. (b)). At the penalty phase, the jury returned death verdicts, and the trial court entered judgments of death. This appeal is automatic. (Cal. Const., art. VI, § 11(a); § 1239, subd. (b).) For the

---

[1] All further undesignated statutory references are to the Penal Code.

1

reasons that follow, we vacate the true findings for the street gang and firearms use enhancements, as well as one multiple-murder special-circumstance finding for each defendant, and otherwise affirm the judgments.

## I. FACTUAL BACKGROUND

### A. Guilt Phase

#### 1. *Prosecution evidence*

On October 29, 1998, at about 11:00 p.m., a Black couple, Edward Robinson and his girlfriend Renesha Ann Fuller, were shot and killed outside Robinson's townhouse at 254th Street and Frampton Avenue in Harbor City. Robinson's sister heard the shots, looked out her second-story window, and saw a big, older model car with horizontal tail lights driving away. Four shell casings were found at the scene. An autopsy revealed that Robinson was shot three or four times. Fuller was shot twice, but one of the bullets may have first traveled through Robinson.

Ernie Vasquez, who was in the area that night, testified that even though few cars were on the road the night of October 29, 1998, on several occasions during a period of 15 to 20 minutes he saw an older Buick Regal or similar model sedan, burgundy or dull red in color, driving near the area of the murders. The car, which contained three or four people Vasquez did not know, had horizontal tail lights. Vasquez later identified Juan Carlos Caballero as the driver. (Caballero was murdered shortly after the murders in this case.) Persons resembling defendant Satele (also known as "Wilbone") and defendant Nunez (also known as "Speedy") were, respectively, in the front passenger seat and backseat of the vehicle. After about 11:00 p.m., while Vasquez was parked in a hotel driveway, he heard shots, ducked down, and then drove away. After driving for about a minute, he saw a

2

body lying in the road, and stopped to assist the victim, who he later learned was Robinson.

Around midnight that same night, about an hour after Robinson and Fuller were murdered, Joshua Contreras met both defendants and Caballero at a neighborhood park. Defendants and Contreras were members of the West Side Wilmas gang. Contreras heard defendant Satele say, "We were out looking for niggers," and heard Satele or Nunez say, "I think we hit one of 'em."

The next evening, Contreras was at a friend's house with several people, including both defendants. Satele appeared nervous, and told Contreras that the murders of the "Black guy and Black girl" that he had shot were "in the news." Satele told Contreras "he was driving right there in Harbor City and he saw a Black guy or Black girl hugging or kissing or something and he just shot them."

Later that night around 3:40 a.m., Los Angeles Police Officers Adam Greenburg and Vinh Nguyen were in a marked police when they saw a car, later identified as a four-door Chrysler, driving with its headlights off. The Chrysler pulled over to the curb. As the officers pulled in front of the Chrysler and activated their car's emergency lights, three occupants fled the Chrysler. (At trial, Officer Greenburg identified defendant Nunez as the person who had been driving and defendant Satele as the person who had been seated in the front passenger seat.) The police pursued Satele and arrested him. On the Chrysler's driver's seat was a white baseball cap with the word "west" on the front and the name "Speedy" on the back. Between the driver's and passenger seats was a large semiautomatic Norinco Mak-90, an AK-47-type assault rifle. The rifle was identified as the murder weapon through ballistics testing. A magazine attached to the weapon contained 26 live rounds of jacketed hollow-point cartridges; the magazine was capable of carrying 30 rounds.

3

Joshua Contreras, who had joined the West Side Wilmas gang shortly before the two murders, told police that both defendants were "riders" — persons who "kill[ed] their enemies" — and that they had an AK-47 rifle they called "Monster." Contreras saw defendant Satele put the AK-47 into the "car that Speedy [defendant Nunez] had" shortly before defendant Satele was arrested. (At trial, Contreras denied or claimed not to remember his statements to police, and those statements were introduced as prior inconsistent statements.)

On December 3, 1998, several weeks after the two murders, Ernie Vasquez and defendant Satele were in a cell in a Los Angeles County jail. When Satele heard that Vasquez was from Harbor City, he asked if Vasquez had heard about the killings there. When Vasquez said, "I think so, yes" or "something . . . to that nature," Satele said, "Well, we did that," or possibly "I did that," adding, "I AK'd them," or "We AK'd them." Vasquez mentioned these statements to police officers on January 6, 1999, after his fingerprint had been found on victim Fuller's car. At Vasquez's request, he was then transferred to the Lynwood jail, which was closer to his home.

On January 7, 1999, defendant Nunez, who was a trusty at Lynwood jail, approached Vasquez. Nunez asked if Vasquez was from Harbor City, and Vasquez said, "Yes." Nunez said he had killed "those niggers . . . in your neighborhood." Nunez mentioned that he had been driving down the street when one of the victims "looked at him wrong," so Nunez "turned back around and blasted" the victim.

On February 9, 1999, Los Angeles Police Detective Robert Dinlocker showed both defendants a photograph of the four-door Chrysler in which they were seen on the night after the murders, and asked them if that car was used in the homicide. Two days later, defendants were falsely told they were going to be booked on murder charges; while being transported together to and from the

4

courthouse their conversations were recorded. Defendant Satele said: "I not even really sweating it dog, because all that shit that they got, that shit's wrong. . . . But if them mother fuckers would have shown me the car that we fuckin' actually did that shit in, fuck, I'd be stressing like a mother fucker."

At defendants' murder trial, Ruby Feliciano testified that she owned the four-door Chrysler in which defendants were seen on the night after the murders. A week earlier, she had taken the car to defendant Nunez for repairs, and he had promised to return the car that evening. He did not do so, and a week later she saw a woman driving her car. When she later told Nunez she was going to report her car as stolen, he threatened her life. After the car was impounded by police shortly after the two murders, Feliciano received a telephone call from Nunez's girlfriend; Nunez, who was in jail, was also on the line. During this three-way conversation, Nunez asked Feliciano to change what she had told the detectives, and his girlfriend asked Feliciano to say that she had spoken to Nunez and his girlfriend at a certain time on the night police recovered the car, and that Nunez had been home at the time.

The prosecution presented evidence of defendant Nunez's animus against Blacks. Esther Collins, who is Black, testified that in September 1997, defendant Nunez, who was intoxicated, came up to her in her garage, and calling her a "nigger," asked for money or drugs. When Collins said she had none, Nunez again called her a "nigger" and spat on her. He then hit Collins in the mouth with a hard object, fracturing her jaw, and said, "[n]igger, get up nigger." Collins's husband, who is also Black, came out to the garage with a "pop gun" in an effort to scare Nunez off. Nunez laughed at him, threw "the word 'nigger' around," and left. Collins, who was afraid of the West Side Wilmas gang (of which Nunez was a member), did not report the incident to the police that day because she did not

5

want trouble. When Collins later reported the assault, she did not mention that Nunez was drunk.

At the time Collins testified against defendants, she was incarcerated. She testified that on one occasion when she and defendant Nunez were on the bus from jail to court, he said, "Are you testifying? Don't testify. Something like that." Nunez also asked, "Where is your son? Is he in custody?" Collins denied she was personally afraid to testify, but said she feared reprisal against her son, who was also in prison, because "[i]t's a black and racial thing in jail." Los Angeles District Attorney's Office Investigator John Neff testified he had spoken to Collins the week before her testimony. Collins told him she was afraid to testify because, while on the transportation bus, "one of the defendants had made a veiled threat by asking how her son was," and then saying, " 'You're not going to testify, are you?' "

The prosecution presented evidence that West Side Wilmas gang members other than defendants had committed crimes. Detective Dinlocker testified that Ruben Figueroa and Brian Dominic Martinez were West Side Wilmas gang members, and the prosecution introduced records of Martinez's conviction for assault with a firearm and Figueroa's convictions for murder and assault with a deadly weapon.

Los Angeles Police Officer Julie Rodriguez testified as an expert on the West Side Wilmas gang. She said the gang's primary activities are "anything that's going to benefit the gang," including narcotic sales and murder. "Associates" of the gang are younger boys who are "trying to prove themselves," and "hang out with the gang members," but who "aren't quite yet" gang members. The area of the two murders was not claimed by the West Side Wilmas but by rival gangs. According to Rodriguez, murdering a Black couple with no gang ties would cause defendants to "move . . . up in the gang." In her view, if defendants here murdered

6

Robinson and Fuller (a Black couple with no gang ties), they did so with the specific intent to promote, further or assist in the criminal activity of West Side Wilmas.

Los Angeles County Deputy Sheriff Scott Chapman, who was assigned to the gang unit at the Men's Central Jail, testified that while rival gang members in the street will attack each other, "[o]nce they come into county jail it becomes a race issue . . . [and] [t]hey bond together to protect themselves." Hispanic gangs sometimes include persons who, like defendant Satele, are of Samoan descent.

### 2. *Defense evidence*

#### a. *Defendant Nunez*

Yolanda Guaca, defendant Nunez's girlfriend and the mother of his two children, testified that Nunez was at home with her from about 9:00 or 10:00 p.m. on October 29, 1998 (the night of the murders), until the next morning. Guaca's mother Sandra Lopez gave similar testimony. Lopez, who lived with defendant Nunez and Guaca, said that the only way in and out of their home was through the front door. Because the front screen door was damaged, once everyone was home she ordinarily tied a string to it in such a manner that the door could not be entered from the outside unless a person inside the house opened it. When she awoke on the morning of October 30, the string had not been disturbed.

Defendant Nunez testified that he was born in National City and was 24 years old. Between the ages of 10 and 12 he stole bicycles for the West Side Wilmas. When he was "[m]aybe 12" years old he became a member of the gang and began selling rock cocaine and sometimes marijuana. Between the ages of 14 and 20 he was incarcerated for auto theft and selling cocaine. While incarcerated he and three other inmates assaulted two other Latino gang members.

7

After his release at age 20, defendant Nunez moved into the Norwalk home his mother shared with her husband, defendant's younger sister, and his younger brother. He worked in a warehouse for several months, but he had difficulty getting a ride to work and did not know how to take the bus. He was accepted at Cerritos College, but left the area before the semester began.

Defendant Nunez left his mother's home after two months because he did not want to interfere with his mother's life. His father, who lived in San Diego, had not helped in raising him, and he did not want to ask his father for anything. He returned to Wilmington and to the West Side Wilmas gang because he "didn't know anything else" to do and did not want to ask for help. He lost his identification documentation, which impeded the few efforts he made to find a job. He started selling crack cocaine and methamphetamine. Between the time of his release at age 20 and his arrest in November 1998 shortly after the two murders here, Nunez had three additional convictions, apparently for gun possession and drug sales or possession. He said: "Practically everything I did was against the law. I wasn't living right."

On the night of the two murders, Yolanda Guaca picked defendant Nunez up about 9:00 p.m. They bought takeout food and went home, and defendant went to bed. He woke once during the night to speak with a visitor, went back to sleep, and then woke up again in the morning. On cross-examination, he conceded that he sometimes left in the middle of the night without Yolanda's knowledge. He denied meeting Joshua Contreras at a park a half-hour after the murders, and denied that he had ever been a jail trusty.

Defendant Nunez said that Ruby Feliciano rented her car to him in exchange for drugs. When he was arrested in November 1998 shortly after the two murders, he thought he was being charged with stealing her car. He asked Yolanda to call Feliciano and ask her to tell the police "the truth," which was that he had not

8

stolen her car. He "sort of threatened" Feliciano, telling her that if she visited, she should bring the money she owed him.

Defendant Nunez admitted assaulting Esther Collins. He said that he had been drunk and had hit Collins with a small, hard handball because she had not paid a debt. He had "no excuse" for hitting her, but he denied that he hit her because she was Black.

On cross-examination, the prosecutor introduced defendant Nunez's statements during a December 1998 interview with detectives. In the interview, Nunez was asked if he had a history of "hating Black people." He replied, "I don't hate them. I believe in segregation, but I mean, why would I go and shots [*sic*] any Black person, there is a lot of them in Wilmington." He also said, "I can't stand how they get loud. . . . I just believe in segregation. I don't like them [too] much by me, that's what I'm saying. Why I would go all the way to Harbor City to just shoot a Black person?" The prosecutor played a segment of the February 11, 1999, tape recording of both defendants' conversation in the jail van transporting them to court (see pp. 4-5, *ante*), in which Nunez said he wanted "no Black people, woods straight woods." After listening to this segment, Nunez testified that the term "woods" means "White people." He said he and defendant Satele did not discuss the murders in the van.

Jacqueline Oree testified that her 16-year-old twin sons, Jayson and Jonathan Brooks, who are Black, were friends with both defendants for about six years when Oree lived in Wilmington, and that defendant Nunez came over two or three times a week. Defendant Satele watched her house while she was on vacation, never spoke derogatorily about Black persons or used the word "nigger," and never harmed her sons physically or emotionally. Oree's two sons were involved with the West Side Wilmas gang, an activity she did not approve of. Oree moved out of the West Side Wilmas's territory in August 1999.

9

Jayson Brooks, Oree's son, testified that he had known both defendants for about three or four years, that all three of them were in the West Side Wilmas gang, and they spent their time doing recreational activities such as playing basketball, swimming, and having barbecues.

Byron Wilson, who had been convicted of murder and sentenced to death, testified that he knew defendant Nunez in jail from September 1999 to April 2000. For most of this period, defendant Nunez was a jail trusty. Wilson never heard him use "the N-word."

Vondrea Williams, who was in custody awaiting trial on charges of aggravated mayhem and assault with a deadly weapon, testified that he had met defendant Nunez in jail about eight or nine months earlier. Williams and Nunez were jail trusties, and the two alternated shifts. Williams, a Black man, said that Nunez showed no prejudice and treated Black inmates with respect.

Jesus Esparza, who was in jail while awaiting trial on an attempted murder charge, testified that he had been in a cell next to Nunez's for several weeks. He never heard Nunez refer to Blacks in disparaging terms, nor were there any incidents between Nunez and any Black inmate. On one occasion in December 1999, when the cells were going to be searched, Esparza threw a four-foot-long hard object made from tightly wrapped paper out of his cell into the hall. The guards assumed the object belonged to defendant Nunez, even though Esparza claimed it was his. Nunez stood silent, and was punished with 20 days in the "hole," a place Esparza described as "sort of" like solitary confinement.

David Butler, a firearms examiner, retired Los Angeles police officer, and "distinguished member" of the Association of Firearm and Toolmark Examiners, testified that the casings found at the murder scene bore marks consistent with having been fired from the gun found in the car in which defendants were riding the night after the two murders. The magazine attached to this gun held 30

10

rounds. The bullets contained steel penetrators, and were originally designed to penetrate light armor on military vehicles. In Butler's view, the shooter was fairly stationary when the shooting occurred. He could not tell whether the shooter fired from inside a car, but if so, the car was stopped at the time of the gun's discharge.

### b. Defendant Satele

Lawrence Kelly testified that he had been a member of the West Side Wilmas for 12 to 13 years. The gang had between 30 to 40 active members. One way the gang made money was by selling narcotics; some gang members may also have committed robbery and assault with a deadly weapon, but the gang did not do drive-by shootings. A gang member who testified against another gang member would be "beat up" or even killed.

At about midnight on the night of the murders (committed around 11:00 p.m.), Kelly met defendant Satele at a park playground. Also present were defendant Nunez, Joshua Contreras, and Juan Carlos Caballero. Kelly was at the park for "a minute or two," and then walked with defendant Satele to the nearby home of Kelly's girlfriend. Contrary to what Contreras told the police, Kelly did not hear defendant Satele say, "We were out looking for niggers," nor did he hear either defendant say, "I think we got one." At this time, Kelly owned a 1980 brown Buick Regal. (As previously mentioned, prosecution witness Ernie Vasquez testified that on the night of the murders he saw an older Buick Regal or similar model sedan driving near the area of the murders, and that persons resembling Nunez and Satele were passengers in the car.)

Kelly identified exhibit No. 48, the murder weapon, as a gun to which everyone in the West Side Wilmas gang had access, adding that the gun was used to protect gang members engaged in drug transactions.

11

Kelly had known defendant Satele for about two years and had never heard defendant Satele "use the 'N' word" or display disrespect for Black persons.

Kelly knew Joshua Contreras (a prosecution witness), and saw him nearly every day during 1998, the year of the two murders here. On most occasions, Contreras was under the influence of crystal methamphetamine and "[v]ery paranoid." Kelly explained: "He would think people were after him or what not or saying things. His mind was just playing tricks on him and stuff."

Richard Satele, defendant Satele's father, testified that his son had never exhibited racial bias and had been taught to "respect all races and all people."

Darnell Demery, the husband of defendant Satele's cousin, testified that he had never heard Satele say anything derogatory about Blacks or "use the 'N' word," nor had he seen Satele being verbally or physically aggressive. Satele did not have a bad temper and got "along with everybody." Demery was not aware that Satele was involved with the West Side Wilmas gang.

Willy Guillory, a teacher at defendant Satele's high school and a longtime family friend, testified that Satele caused no problems at school, had never referred to Black persons as "niggers," and had never behaved "against any racial component in our society."

The parties stipulated that, if called to testify, Los Angeles Police Officer Simmons would testify that she had interviewed murder victim Edward Robinson's sister on October 29, 1998, at the scene of the shooting, and that her report stated that the sister had said: "We were all inside my apartment playing cards, it was time for [murder victim Fuller] to go home. My brother walked her outside to her car. I went outside on my patio that overlooked the street, to ask my brother if he locked the front door. . . . Before I had a chance to ask him anything, I heard about seven shots or more. Then I saw a small gray-colored car driving down the street."

12

Dr. Lewis Yablonski, a gang expert, testified that to familiarize himself with the West Side Wilmas gang, he had interviewed four members – defendant Satele, Lawrence Kelly, and Jayson and Jonathan Brooks. Dr. Yablonski was of the view that defendant Satele had no "special hostility towards Black people."

According to Dr. Yablonski: "[W]hen a gang member is in jail, there is an issue of survival. Consequently, he may . . . brag a lot to indicate he's bad." People in custody, Dr. Yablonski said, brag about crimes they did not commit to gain a reputation. If defendant Satele, while in jail, told a rival gang member of Hispanic descent, "We did a shooting," this would mean he was trying to impress the other person with the fact that his gang was tough and violent, and to warn the other person to leave him alone. The word "we" in this context would not necessarily mean the person making the statement was involved in the crime, but rather would refer to the gang's activity, much as one might say of one's basketball team, "We beat Indianapolis." If an inmate was bragging about something he personally did, he would be more likely to say "I" than "we," but if one inmate said "we" committed a double murder, and another inmate said "I" committed the same murder, the pronoun used would not necessarily be significant in ascertaining who committed the crime.

### 3. Rebuttal evidence

Glenn Phillips testified that in November 1999, defense witness Lawrence Kelly visited Phillips's home in Redondo Beach, where Kelly spoke to Warren Battle, who was Black and worked for Phillips. Kelly asked if Battle would like to "make a hundred bucks to do a job for him." Battle replied, "Yes, of course" and Kelly then said he needed Battle "to testify we get along with Black people."

Los Angeles County Deputy Sheriff Larry Arias testified that on November 9, 1999, he was escorting a Black inmate named Keys in the Men's Central Jail.

13

Keys, who was "waist chained" and could not raise his hands to his face, was punched in the face by defendant Satele and fell to the ground. Keys had not provoked the attack.

Los Angeles County Deputy Sheriff John Kepley testified that on December 2, 1999, he conducted a random search of a module in the Men's Central Jail. Each cell housed one inmate. While standing in front of cell 14, he saw an inmate in cell 16 walk up to the gate, look down the row, and throw the "shaft" of a "spear" into the area in front of the cell. Jail records showed that defendant Nunez was assigned to cell 16. Kepley did not recall any inmate claiming responsibility for throwing out the object.

## B. Penalty Phase

### 1. *Prosecution evidence*

The prosecution presented victim impact testimony and evidence of defendant Nunez's jail misconduct.

Testifying about 21-year-old murder victim Renesha Ann Fuller were Roberta Hollis (Renesha's mother) and Simon Hollis (Renesha's stepfather). (Because each victim has the same surname as several of the penalty phase witnesses, we refer to the victims and witnesses by their first names in this portion of the opinion.) Roberta provided transportation to persons with AIDS, and Simon was an Inglewood police officer. Roberta described Renesha as quiet, sweet, and innocent: a "mother's . . . dream in a child." After Renesha's murder, Roberta missed six months of work.

Roberta and Simon testified that Renesha did well in school, and had just started her first year of college when she was killed. She worked as a teacher's aide at a school for students who had "dropped out of school and had hard times." After the murder, Renesha's students started a college scholarship in her name.

14

Testifying about 22-year-old murder victim Edward Robinson were Leandrea Fields-Robinson (Edward's stepmother), Albert Robinson (Edward's father), Rosa Robinson Morris (Edward's sister), and Renesha Robinson (Edward's niece). Leandrea, a former teacher and counselor, was an administrator for the Los Angeles Unified School District. Albert was in the construction industry, and specialized in installing tennis courts. After Edward's mother died in childbirth, Leandrea raised Edward from the time he was three months old.

Murder victim Edward was close to his father, and Leandrea said the two would talk for hours "about being a man and doing the right thing." Edward attended Harbor City College, and worked part-time for his father to help pay for school. Edward led a prayer group at church, was the church drummer, and was the kind of person "that any mother or father would love to have to call their son." His father recalled that "a lot of young people his age . . . said because of him they turned their lives around and started going to church and studying the Bible." Edward was taught to respect women, and it was reflective of his character that he was walking Renesha to her car on the night they were murdered.

Los Angeles County Deputy Sheriff Randall Shickler testified that on August 17, 1999, he and another deputy transported defendant Nunez from court back to jail. Nunez was in the front section of the bus with about 12 other inmates, and one of his hands was handcuffed to a chain. Shickler heard a ratcheting sound and saw that Nunez, no longer handcuffed, was standing over another inmate. He refused orders to recuff, laughed, and began doing jumping jacks to demonstrate to Shickler that he was free. After the bus reached the jail, when other deputies who had been called out to assist were visible from inside the bus, Nunez put his handcuffs back on. The officers determined that the handcuffs of about 10 inmates on the bus had been altered.

Los Angeles County Deputy Sheriff Lisa Estes testified that on one occasion in the middle of trial she searched defendant Nunez after he arrived from jail and before he appeared in court. She found a razor blade in a Bible Nunez was carrying.

Los Angeles County Deputy Sheriff Ronald Baltierra testified that on May 8, 2000, he saw another deputy search defendant Nunez before a court appearance. In Nunez's mouth, the deputy found a heavy-duty staple, which in Baltierra's opinion could be used to unlock handcuffs.

### 2. Defense evidence

#### a. Defendant Nunez

Jorge Flores, defendant Nunez's father, testified that he and Betty Nunez, defendant Nunez's mother, lived together while she was pregnant with defendant Nunez. After he was born they continued to see each other for a couple of years. Jorge had seen defendant Nunez about "seven times." He did not counsel and guide him as he was growing up. The last time he had seen defendant Nunez was in 1980 or 1981, when Jorge borrowed a car from the family and never returned it. After about 1984, when he married, he was under the impression that Betty did not want her family to give him any information about defendant Nunez's location, and wanted Jorge to stay away from him. He regretted not being there for defendant Nunez and guiding him.

Antonio Nunez, defendant Nunez's uncle, testified that Betty Nunez was his half sister. Their mother had a drinking problem. Antonio was 13 or 14 years old and Betty was about 18 years old when defendant Nunez was born. At the time, Betty was homeless and stayed with various relatives and friends, including Antonio's family; she was inexperienced at caring for an infant. Her resources were extremely limited, and often when Betty was at Antonio's home there was no

16

food or clean diapers for defendant Nunez. Betty was an emotionally distant mother.

About a year after defendant Nunez was born, Antonio left school to support the family. He eventually bought a house in Wilmington, and Nunez (who was eight or nine years old) and Betty lived with him. Antonio worked long hours, and Betty worked at night, so Nunez was left unsupervised. Nunez was excited when he did well in Little League, and Antonio regretted not going to more of his games or understanding its importance to him. Nunez was jealous of Antonio's wife when Antonio got married. When Nunez was between 12 and 14 years old, the police raided Antonio's house looking for gang members. As a result, Antonio became concerned for his family's safety and asked Betty and Nunez to move out.

Yolanda Guaca, defendant Nunez's girlfriend and the mother of his two young sons, said she loved him and did not want to see him executed.

Dr. Saul Niedorf, a psychiatrist and pediatrician, testified that he had interviewed defendant Nunez, and had also spoken with his mother, his uncle Antonio, two of his aunts, and Yolanda Guaca. He had reviewed Antonio Nunez's trial testimony and at least some of defendant Nunez's records from the former California Youth Authority. He did not administer any tests, but he considered it likely that defendant Nunez could read at a high school level.

Dr. Niedorf noted defendant Nunez's lack of bonding with his mother, and said defendant's uncle Antonio was his first consistent bond. As a result of Antonio's influence, Nunez was later a tender and caring father. When Nunez was about 10 or 11, he lost this consistent attachment because Antonio became invested in married life. Nunez looked for teenage boys to be attached to, and found this attachment in gang members. In Dr. Niedorf's view, defendant was compulsive and obsessive, and methodically and loyally worked at his "job" of selling drugs. He participated in a work program while incarcerated as a teenager,

17

and Dr. Niedorf noted that there are work programs in the California prison system.

In Dr. Niedorf's opinion, defendant Nunez was "relatively free of explosive irrational behavior[]," and thought before he did things unless he was provoked. Dr. Niedorf viewed his acts of misconduct in jail as acts of defiance that developed his self-esteem. They were not based on a desire to escape, although that desire was there, nor were they explosive or aggressive. He agreed, however, with the prosecutor that such misconduct "can create an explosive situation," and that "going to a rival gang territory with a loaded assault rifle . . . with armor-piercing bullets and driving around in that area and looking to kill someone" was aggressive. In Dr. Niedorf's view, defendant Nunez "believe[d] he did not kill" and "grieve[d] that there were victims in this crime, who, as he would put it, were innocent."

### b. Defendant Satele

Testifying on defendant Satele's behalf were his parents, Richard and Esther Satele. Richard was 26 years old and Esther was 20 years old when Satele was born, which occurred four or five months after Richard and Esther were married. Richard worked long hours at two jobs during their first two years of marriage, and started to drink. They had physical fights in Satele's presence. When Satele was two or three years old, Esther left. Richard quit his night job and moved in with his parents in Carson, who helped to raise Satele until he was about 12 years old.

When Richard was not at work, he tried to spend as much time with defendant Satele as he could. Satele was active in sports, and Richard attended every sports practice and took time off from work to attend the games. Every year

18

from the time Satele was five years old they vacationed in places like Samoa, Hawaii, or Palm Springs.

Esther visited her son once or twice a year when he was between the ages of two and a half and five, and about once a month after that. When defendant Satele was about seven or eight years old, he visited Esther on weekends. Every time she brought Satele back to Richard's house he was in tears and wanted to stay with her. Esther did not have her own home, but lived with her sister, and she did not think that environment would be best for her son. When Satele was 11 or 12 years old, Esther returned to live with him and his father. She was never involved with Satele's education, and she did not meet his teachers or attend school functions.

When defendant Satele was about 12 years old, Richard bought a house in Redondo Beach. Satele was unhappy that he had to change schools. He was caught "tagging" (spray painting graffiti) at the school and was suspended. Richard typically disciplined Satele by slapping or using a belt, and on this occasion he "gave him a good beating" with a belt. Satele was caught tagging again a couple of months later, and told the school he did not want to go home because his father would beat him. The school contacted child protective services, which told Richard that corporal punishment was against the law and he could be prosecuted if another incident occurred. Richard turned to other forms of discipline, such as denying privileges, but "troubles just kept on increasing."

Defendant Satele ran away on one occasion for a weekend, and on another occasion for a week, and Richard did not know where he was during those times. Richard asked Satele what they could do to stop this activity, and Satele said he wanted to return to Carson and live with his grandparents. Richard allowed him to do so, and every day he drove his son to school in Carson. Satele ran away from his grandparents' house as well, and began cutting classes. He received A's and

B's in classes he liked, such as math, and D's and F's in classes he disliked, such as English.

When defendant Satele was about 15, he was caught tagging again. Because of his previous offenses, he was incarcerated for three months in juvenile camp. Richard and Esther visited him every weekend. After leaving camp, he seemed to communicate more openly with his parents, and was interested in graduating from high school and possibly playing football.

When defendant Satele was 16, the police found him carrying a gun. He was placed in a military boot camp for about four months, and Richard said he received "rav[e] reviews." Satele acknowledged that he needed discipline and did well in that environment. He was about 17 years old when he was released, and expressed a desire to graduate from school and "do good." He took night classes in addition to his regular school schedule so he could catch up. Six months later, when he was still 17 years old, he left home and dropped out of continuation school. Richard eventually found him in Wilmington. Although he knew how to contact Satele if he needed to, he left his son alone to fend for himself.

Looking back on defendant Satele's life, Esther believed she had failed him "constantly" as a mother. Richard asked the families of Renesha and Edward to forgive his son and asked the jury to spare his life.

Dr. Samuel Miles, a psychiatrist, testified that he interviewed defendant Satele three times and also interviewed Satele's parents. Esther and Richard split up and reconciled many times, and Satele's lack of consistent interaction with them, according to Dr. Miles, significantly affected the development of his identity. Satele's first memory was of riding a skateboard at about the age of 11; although he also recalled events between the ages of two and six, Dr. Miles could not be certain these were not "indirect memor[ies]" related to Satele by another individual.

20

In Dr. Miles's view, being in a gang provided defendant Satele a consistent environment where he was accepted, which he could not get at home. Richard's physical punishment of Satele alienated Satele, and left Richard with no effective form of discipline when he stopped using it. Although Satele was 20 years old when Dr. Miles first interviewed him, "emotionally he was more like 12." Dr. Miles acknowledged that despite Satele's emotional immaturity, he knew the difference between right and wrong.

Dr. Miles administered the Minnesota Multiphasic Personality Inventory to defendant Satele; the results were "highly pathological," showing someone in turmoil who had identity problems and might be psychotic. He asked for additional testing of Satele by a psychologist, on which Satele scored in the borderline range in intelligence, but not low enough to be considered mentally retarded. On the Wide Range Achievement Test, Satele scored "in the average range for someone who is in high school," and reported he took no special classes for the learning disabled. Satele gave few responses on the Rorschach inkblot test, which can occur when a person is "overwhelmed by [the ink blots] and excited or very guarded." His responses on the "Milikin clinical, multi-axle test" (*sic*: most likely the Millon Clinical Multiaxial Inventory) showed "some turmoil and a history of some problems with the law."

According to Dr. Miles, defendant Satele did not have hallucinations. Dr. Miles believed that at times Satele may have experienced paranoid delusions, but Satele denied doing so. Satele said he generally became "paranoid when he was up a lot and on . . . amphetamine." He told Dr. Miles he drank heavily and used methamphetamine four or five days at a time. According to Dr. Miles, an individual who has experienced paranoia while using amphetamine is more likely to become paranoid when using the drug again. Satele said that around the time of the murders he was "loaded" and had not slept for several days.

21

Dr. Miles concluded that defendant Satele lost control when he was agitated, was impulsive and aggressive, and had turmoil, identity problems, paranoia, low self-esteem, and "fragility." The combined effect of these circumstances left Satele with "less than the average amount of control over impulsiveness," "prone to undue influence[] from others," and more of a follower than a leader. They also made him subject to substance abuse, and when abusing substances to have "periodically bad experiences" that made him react to others in a hostile fashion. Dr. Miles diagnosed Satele with amphetamine abuse, alcohol abuse, probable psychosis not otherwise specified, and borderline personality disorder.

## II. DISCUSSION

### A. Pretrial Issues

#### 1. Excusal of prospective juror based on her death penalty views

##### a. Factual background

On her juror questionnaire, in response to the question "In what ways, if any, might your religious views affect your service as a juror in this case," Prospective Juror No. 2066 wrote: "I would not send any person to death. The Bible say[s] thou shalt not kill." In response to the question "Would you, because of any views that you may have concerning capital punishment, refuse to find the defendant guilty of first degree murder, even though you personally believe the defendant to be guilty of first degree murder, just to prevent the penalty phase from taking place" she wrote, "I don't know yet." When asked whether, because of her views on capital punishment, she would refuse to find a special circumstance true, even though she personally believed it to be true, "just to prevent the penalty phase from taking place," she said, "No."

When asked on the questionnaire whether she would "automatically refuse to vote in favor of the penalty of death and automatically vote for a penalty of life

22

imprisonment without the possibility of parole," Prospective Juror No. 2066 wrote "Yes." Asked if she would change her answer to this question if she was instructed and ordered by the court that she must consider and weigh the aggravating and mitigating factors regarding the facts of the crime and the background and character of the defendant before voting on the issue of penalty, she wrote, "I might." In response to the question "Could you set aside your own personal feelings regarding what the law ought to be and follow the law as the court explains it to you" she wrote, "I don't know if I could." Asked to describe her "general feelings about the death penalty," she wrote, "I don't feel at ease with it." When asked to identify the statement "that best describes your views on the death penalty," she selected, "While I am strongly opposed to the death penalty, I do believe there are rare cases where a death sentence should be imposed for a deliberate murder." When asked, "Can you fairly and impartially listen and weigh the evidence, set aside any moral, religious, or personal views and/or beliefs you may have about the death penalty to render a verdict in accordance with law" she wrote, "I don't know."

On voir dire, the trial court asked Prospective Juror No. 2066 what she meant by her response of "I don't know yet" to the question asking whether her views on capital punishment would cause her to find a defendant not guilty of first degree murder, even if she personally believed him to be guilty, to prevent the penalty phase from taking place. She replied: "Undecided. I would kind of make it lenient." The court later asked, "[I]f you were to sit as a juror in a case in which the death penalty is sought, and you get to the penalty phase, . . . would you be able, upon consideration of any aggravating and mitigating factors, to impose the death penalty if you feel it is warranted? Would you be able to vote for it, in other words?" She replied: "I probably would be hesitant. I wouldn't want to vote for . . . the death penalty."

23

The prosecutor then said to Prospective Juror No. 2066, "I think that coincides with your answer . . . where you said, 'I don't feel at ease with it.' " She replied, "Right." The prosecutor began, "I take it that it's such a difficult decision for you —" Prospective Juror No. 2066 interrupted to say, "Yes, it is." The prosecutor continued "— that you could not vote for the death penalty?" She said, "Yes."

Defendant Nunez's counsel asked, "Is it correct that after you hear all of the evidence you will follow the instructions on the law and do what the law requires you to do in this state based upon how you find the facts to be?" Prospective Juror No. 2066 replied, "I'll do my best, yes."

The trial court asked Prospective Juror No. 2066 whether she would automatically exclude the possibility of voting to impose the death penalty if she concluded the facts of the case warranted such a penalty. She replied, "If there were other alternatives, I would probably . . . look at those first before choosing the death penalty." The court stated there would be only two choices at any penalty phase, and asked, "Would you weigh the evidence to decide which alternative between the two you should choose?" Prospective Juror No. 2066 replied, "Yes." The court subsequently asked, "And if the evidence on the aggravation and mitigation warrants that the . . . death penalty should be imposed, would you be able to vote for death, knowing there is a possibility that you could choose life without possibility of parole?" She replied, "Yes."

The prosecutor explained to Prospective Juror No. 2066 again that her two choices at the penalty phase were voting for the death penalty or for life imprisonment without the possibility of parole, and inquired whether she would "automatically vote for the life in prison sentence." Prospective Juror No. 2066 said, "Yes." The prosecutor asked, "Even if I put on a bunch of aggravating

24

factors about various things, would you still vote for that life sentence?" She replied, "Yes, I think I would."

Defendant Nunez's counsel asked, "Can you conceive of a crime so heinous that you would ever vote for death?" Prospective Juror No. 2066 responded, "No, I don't think so." Counsel subsequently asked, "If . . . you see there are only two alternatives, he goes to prison . . . for the rest of their natural life, or they go up to prison to be killed; are you saying you could never, ever, no matter what it was, say, 'Well, I will vote for death?' " She replied, "Yes, I'm saying that right now." Counsel asked, "You didn't say that a minute ago?" She said, "Maybe the question was presented to me a little different."

The trial court asked, "Do you believe that a case could be so bad that you would vote for death?" Prospective Juror No. 2066 replied, "I believe a case could be that bad, but I still wouldn't want to vote the death penalty." The court subsequently asked, "Is it you couldn't or you don't want to, or both?" She replied, "Both."

Defendant Satele's counsel asked, "[I]f you made up your mind that the decision you made up was the prosecution has established to you a belief this person is a really bad person and that person deserves the death penalty, could you do it?" Prospective Juror No. 2066 replied, "It would be hard for me." Counsel said: "I understand. It's hard for everybody. That is [a] tough decision. Could you?" She replied, "I don't know if I could."

The prosecutor challenged Prospective Juror No. 2066 for cause. The trial court sustained the challenge, stating: "This court has examined the juror's state of mind, particularly the demeanor in this case, and the reluctance of the responses, and the equivocal responses that the juror has had, and the conflicting responses that the juror has had. And this court makes the determination as to the juror's state of mind, and she is incapable of imposing the death penalty. And the

25

reason [is] . . . because of her reluctance to be able to do that when asked her the leading question as to whether or not she could impose it under certain circumstances she said, yes; but when asked if there's another choice, life imprisonment, what would she do, she, without reluctance and without equivocation, chose life imprisonment if there's a choice. Given that is the case, and given her responses in the questionnaire, her demeanor in the court and her state of mind as observed by this court, with multiple inferences that are given, the court infers based upon her responses that she is not death qualified and excuses her for cause."

### b. *Analysis*

Defendants contend that the trial court erroneously excused Prospective Juror No. 2066 based on her views regarding the death penalty, in violation of their rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

The Attorney General argues that defendants have forfeited their arguments based on the Fifth and Eighth Amendments because, at trial, they did not challenge the trial court's excusal of Prospective Juror No. 2066 on these grounds, although the Attorney General acknowledges that no objection was required to the extent defendants' challenge is based on the Sixth and Fourteenth Amendments. Under the law applicable at the time this case was tried, "an appellate challenge to a *Witherspoon/Witt* excusal is not forfeited by a failure to object at trial" (*People v. McKinnon* (2011) 52 Cal.4th 610, 637; see *Witherspoon v. Illinois* (1968) 391 U.S. 510; *Wainwright v. Witt* (1985) 469 U.S. 412), although the forfeiture rule applies to defendants who fail to object in cases tried after *McKinnon* became final. (*McKinnon*, at p. 643.) The rule that no objection was necessary applies

26

regardless of the constitutional provision on which the challenge is based. We therefore address defendants' claims on the merits.

"The federal constitutional standard for dismissing a prospective juror for cause based on his or her views of capital punishment is ' "[w]hether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " (*People v. Friend* (2009) 47 Cal.4th 1, 56 (*Friend*), quoting *Uttecht v. Brown* (2007) 551 U.S. 1, 7.) " 'On appeal, we will uphold the trial court's ruling if it is fairly supported by the record.' " (*People v. Barnett* (1998) 17 Cal.4th 1044, 1114.) "When the prospective juror's answers on voir dire are conflicting or equivocal, the trial court's findings as to the prospective juror's state of mind are binding . . . if supported by substantial evidence." (*People v. Duenas* (2012) 55 Cal.4th 1, 10.)

Here, Prospective Juror No. 2066 equivocated and gave conflicting responses to questions pertaining to her ability to follow the law concerning imposition of the death penalty. On the one hand, she wrote on her juror questionnaire that she "would not send any person to death" because "[t]he Bible say[s] thou shalt not kill," and that she would refuse to vote in favor of the death penalty and would automatically vote for a penalty of life imprisonment without the possibility of parole because of her views concerning capital punishment. On voir dire, she agreed with the prosecutor that she "could not vote for the death penalty." On the other hand, Prospective Juror No. 2066 also answered "yes," when asked if she would "weigh the evidence to decide" whether to vote for death or life imprisonment without the possibility of parole, and she said she would be "able to vote for death" if she concluded that "the evidence on the aggravation and mitigation warrants that the . . . death penalty should be imposed."

The trial court was in a position, which we are not, to view Prospective Juror No. 2066's demeanor, and its determination of her state of mind is binding.

27

"Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." (*Uttecht v. Brown*, *supra*, 551 U.S. at p. 9.) "Hence, the trial judge may be left with the 'definite impression' that the person cannot impartially apply the law even though, as is often true, [she] has not expressed [her] views with absolute clarity." (*People v. DePriest* (2007) 42 Cal.4th 1, 21.) Here, substantial evidence supports the trial court's determination that Prospective Juror No. 2066's views on the death penalty would prevent or substantially impair her ability to serve as a juror.

The cases on which defendants rely (*People v. Heard* (2003) 31 Cal.4th 946; *People v. Pearson* (2012) 53 Cal.4th 306 (*Pearson*)) are inapposite. Unlike the prospective juror wrongly excused in *Heard*, Prospective Juror No. 2066 did not indicate on voir dire she "was prepared to follow the law and had no predisposition one way or the other as to imposition of the death penalty," nor was she generally "clear in [her] declarations that [she] would attempt to fulfill [her] responsibilities as a juror in accordance with the court's instructions and [her] oath." (*Heard*, at p. 967.)

Defendant Nunez asserts it is significant that *Pearson*, *supra*, 53 Cal.4th 306, involved the same trial judge as in this case. The trial here occurred before the trial in *Pearson*. In *Pearson*, we concluded that the trial court erroneously excused a prospective juror whose views on the death penalty in general were "vague and largely unformed" (*id.* at p. 330), but who "made no conflicting or equivocal statements about her ability to vote for a death penalty in a factually appropriate case" (*ibid.*). We observed that the trial court had misunderstood and misapplied *People v. Guzman* (1988) 45 Cal.3d 915, 956 (*Guzman*) (overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13),

28

which held that a prospective juror's use of equivocal phrases such as "I think" or "I believe" when expressing an inability to vote for death did not *preclude* the trial court from properly finding that the prospective juror's ability to follow the trial court's instructions would be substantially impaired. The trial court in *Pearson* erroneously stated that, under *Guzman*, it could excuse a prospective juror because the prospective juror expressed equivocal views about capital punishment in general. This view, we explained, was wrong. *Guzman*, we said, "does not stand for the idea that a person is substantially impaired for jury service in a capital case because his or her ideas about the death penalty are indefinite, complicated or subject to qualifications . . . ." (*Pearson*, at p. 331.)

Here, defendant Nunez argues that certain comments by the trial court earlier in the jury selection process reflect the same misunderstanding of the holding in *Guzman*, *supra*, 45 Cal.3d at page 956, that it expressed during the trial of *Pearson*. Whether or not Nunez is correct, the court's explanation for excusing Prospective Juror No. 2066 does not reflect that misunderstanding. Unlike the prospective juror wrongly excused in *Pearson*, Prospective Juror No. 2066 did not merely express equivocal views about the death penalty in general; rather, she made "conflicting or equivocal statements about *her ability to vote for a death penalty in a factually appropriate case*." (*Pearson*, *supra*, 53 Cal.4th at p. 330, italics added.) Based on those responses, the trial court found that Prospective Juror No. 2066 "is incapable of imposing the death penalty." This finding was tantamount to a finding that her views about the death penalty would " ' "substantially impair" ' " her ability to perform her duties as a juror. (*Friend*, *supra*, 47 Cal.4th at p. 56.) Because substantial evidence supports that finding, the trial court properly excused Prospective Juror No. 2066 for cause.

## 2. *Denial of defense challenge for cause*

Defendants contend that the trial court erred in denying their challenge for cause to Prospective Juror No. 8971, who was later sworn as an alternate juror and eventually served on the penalty jury.[2] Defendants forfeited this claim because defendants did not use an available peremptory challenge to remove Prospective Juror No. 8971. " 'As a general rule, a party may not complain on appeal of an allegedly erroneous denial of a challenge for cause because the party need not tolerate having the prospective juror serve on the jury; a litigant retains the power to remove the juror by exercising a peremptory challenge. Thus, to preserve this claim for appeal we require . . . that a litigant actually exercise a peremptory challenge and remove the prospective juror in question.' " (*People v. Jones* (2012) 54 Cal.4th 1, 45.) Defendants failed to do so, and cannot now complain about the trial court's asserted error.

### B. Guilt Phase Issues

#### 1. *Challenge to impeachment of Lawrence Kelly*

##### a. *Factual background*

Lawrence Kelly testified on behalf of defendant Satele that he had been a member of the West Side Wilmas gang for 12 to 13 years, that he had known

---

[2]   In this and certain other appellate claims defendants contend the asserted error infringed upon their constitutional rights. In those instances where they did not present constitutional theories below, "it appears that either (1) the appellate claim is one that required no objection to preserve it, or (2) the new arguments are based on factual or legal standards no different from those the trial court was asked to apply, but raise the additional legal consequence of violating the Constitution" (*People v. Loker* (2008) 44 Cal.4th 691, 704, fn. 7), and to that extent their new constitutional arguments are not forfeited on appeal (*ibid.*). "No separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time here." (*Ibid.*)

defendant Satele for about two years, and that he had never heard Satele "use the 'N' word" or display disrespect for Black persons. This testimony contradicted evidence introduced by the prosecution that Satele had referred to Blacks as "niggers." Kelly also testified that he was present with both defendants at a park playground about midnight on the night of the murders, and he did not hear defendant Satele say, "We were out looking for niggers," or either defendant say, "I think we got one." This contradicted the prosecution's evidence that defendants made these statements.

On cross-examination, Kelly denied that while at the house of Glenn Phillips, Kelly had offered a Black person $100 either to testify that West Side Wilmas and "African Americans get along," or to say, "We get along."

When the prosecutor called Glenn Phillips to testify on rebuttal, defendant Nunez objected under Evidence Code section 352, and defendant Satele objected that the testimony was irrelevant. Outside the jury's presence, the trial court held a hearing, at which Phillips testified that in November 1999, Lawrence Kelly visited Phillips's home, where he spoke to Warren Battle, a Black man who worked for Phillips. Kelly asked Battle if he wanted to "make a hundred bucks," explaining that he needed Battle to testify that "we get along with Black people." Kelly did not say who he meant by the word "we," but Phillips assumed he was referring to the West Side Wilmas gang.

The prosecutor offered Phillips's testimony for the purpose of impeaching Kelly, who had denied offering anyone money to testify. The trial court precluded the prosecutor from asking Phillips whom he thought Kelly was referring to when Kelly used the word "we," but it allowed the remainder of the testimony, finding that it directly controverted Kelly's testimony, and that its probative value outweighed its prejudicial effect. Phillips then testified before the jury regarding

31

Kelly's statement. His testimony was consistent with his testimony at the hearing. (See p. 13, *ante*.)

> b. *Analysis*

Defendants contend the trial court should have sustained their objection to the impeaching testimony by witness Phillips, described above in part II.B.1.a. We disagree.

"Rebuttal evidence is relevant and thus admissible if it 'tend[s] to disprove a fact of consequence on which the defendant has introduced evidence.' [Citation.] The trial court is vested with broad discretion in determining the admissibility of evidence in rebuttal." (*People v. Clark* (2011) 52 Cal.4th 856, 936; see *People v. Mills* (2010) 48 Cal.4th 158, 195 [the trial court has "broad power to control the presentation of proposed impeachment evidence"].) Here, as the trial court observed, Phillips's testimony directly contradicted Kelly's testimony on the issue of whether Kelly had attempted to bribe a witness "to testify we get along with Black people," and hence was relevant to assessing Kelly's credibility as a witness. (See *People v. Millwee* (1998) 18 Cal.4th 96, 128 [evidence bearing on a witness's credibility is proper rebuttal].) The trial court therefore did not abuse its discretion in admitting the testimony.

Defendants point out that the prosecution made no showing that they authorized or encouraged Kelly to try to influence a witness, and hence the evidence could not be used to demonstrate their consciousness of guilt. But the evidence was not introduced to show defendants' consciousness of guilt, but to impeach Kelly's credibility. Defendants argue that Phillips's testimony was unduly prejudicial because there was "a high likelihood that the jury [would] misuse the evidence" to "infer consciousness of guilt." Not so. No evidence connected defendants to Kelly's bribery attempt, and the jury was instructed that

"[i]f you find that an[] effort to procure false or fabricated evidence was made by another person for the defendant's benefit, you may not consider that effort as tending to show[] the defendant's consciousness of guilt unless you also find that the defendant authorized that effort."

Defendants point out that Kelly's testimony that he had never offered money to Battle to testify for the defense was first elicited by the prosecution on cross-examination; Kelly had not testified about that subject on direct examination. The prosecution, defendants contend, used its cross-examination questions to Kelly for the purpose of creating the necessity for witness Phillips's testimony impeaching Kelly. The trial court, they assert, should have forestalled this tactical maneuver by excluding Phillips's testimony. Even if we assume for the sake of argument that defendants' objection at trial was adequate to preserve this claim, it lacks merit. The prosecutor was free to explore on cross-examination whether Kelly had attempted to bribe a witness because such evidence was relevant to Kelly's credibility. Once Kelly denied the event, Phillips's testimony was admissible to impeach Kelly. Although defendants are correct that Phillips's testimony would not generally have been admissible if Kelly had admitted that the bribery attempt conversation had occurred, that does not mean Kelly's attempted bribe was a collateral issue.

Defendants assert that in closing argument, the prosecutor misstated the purpose for which the trial court had admitted Phillips's impeaching testimony, thereby increasing the likelihood that the testimony would confuse the jury. The prosecutor argued: "Glenn Phillips was called to show you that . . . [Kelly] offered an African-American a hundred dollars to say we get along. Is [Kelly] a witness . . . you are going to believe in this courtroom? Somebody that . . . would go to the extent of going up to [an] African-American and say if you go into court and say something for us. Mr. Phillips has no axe to grind in here. . . . [Kelly] is

33

the person who hangs around Glenn Phillips [and] . . . offered a hundred dollars to a witness to lie in this case.  What does that tell you about [Kelly], and his testimony here?"  The prosecutor also argued, "I've already spoken about the fact that [Phillips] said [Kelly] bribed an individual with [a] hundred bucks to come in here and lie."

Defendants did not object to the prosecutor's argument at the penalty phase or seek an admonition, and no exception to the general rule requiring an objection and request for admonition is applicable. The claim is therefore forfeited.  (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 (*Samayoa*).)  It also lacks merit. Defendants point out that in the argument quoted above, the prosecutor claimed that Kelly had tried to bribe a witness.  But, defendants assert, Phillips's testimony was admitted only to impeach Kelly's testimony, not to show that an attempted bribe occurred.  The prosecutor's argument, they reason, most likely caused the jury to draw the improper inference that defendants had asked Kelly to offer the bribe.

We see nothing improper in the prosecutor's argument, nor is there a reasonable likelihood that it would have caused the jury to draw the improper inference described above.  While the prosecutor was not entitled to invite the jury to infer that defendants were responsible for Kelly's bribery attempt, nothing in the prosecutor's challenged comments asked the jury to draw such an inference. Thus, contrary to defendants' contention, the prosecutor's argument was not confusing, did not ask the jury to draw improper inferences, and did not increase the likelihood that they would be prejudiced by Phillips's testimony.

34

## 2. Challenge to evidence on rebuttal that defendant Satele hit an inmate

### a. Factual background

During the defense case, Darnell Demery, the husband of defendant Satele's cousin, testified that he had never heard Satele say anything derogatory about Black persons or "use the 'N' word." Nor had he seen Satele being aggressive, argumentative, or physical with anyone. Satele, Demery claimed, did not have a bad temper and got "along with everybody."

At sidebar, the prosecutor sought the trial court's permission to ask Demery if he was aware that defendant Satele had attacked other inmates in jail when those inmates were restrained, and whether those incidents would affect his opinion of Satele. Satele's counsel appeared to note that one victim was Black and the other Asian. The trial court precluded this line of cross-examination, finding its "probative value outweighed by the prejudicial effect."

After this ruling, three defense witnesses testified that defendant Satele was not prejudiced against Blacks. Satele's father testified that his son had never exhibited racial bias and had been taught to "respect all races and all people." Dr. Lewis Yablonski, the gang expert who had interviewed Satele and several other West Side Wilmas gang members, testified that he did not detect any racial animus, and was of the view that Satele had no "special hostility towards Black people." And Willy Guillory, a teacher at Satele's high school and a longtime family friend, testified that Satele caused no problems at school, had never referred to Black persons as "niggers," and had never behaved "against any racial component in our society."

At the end of Guillory's testimony on direct examination, the prosecutor again sought to introduce evidence that defendant Satele had assaulted handcuffed inmates on two occasions. He argued that these attacks showed racial animus and

35

that Satele had opened the door to the testimony. The trial court allowed the inquiry. The prosecutor then asked Guillory if his opinion that Satele treated people of other races appropriately would change if he knew that Satele, while in jail, had punched a handcuffed Black inmate in the face. Guillory said he would "find that highly unusual." The prosecutor then asked, "What happens if I also told you" that Satele had slugged an inmate who was handcuffed to another inmate. Guillory responded, "I would say it's . . . not the young man I knew . . . in high school."

On rebuttal, the prosecution called Deputy Larry Arias, who testified that on November 9, 1999, he was escorting a Black inmate named Keys in the Men's Central Jail. Keys was "waist chained" and could not raise his hands to his face. Defendant Satele punched Keys in the face, and Keys fell to the ground. Keys had not provoked the attack. In Deputy Arias's opinion, Satele would improve his standing within the Hispanic gangs in jail by attacking a Black man.

### b. Analysis

Defendant Satele contends that Deputy Arias's testimony should have been presented in the prosecution's case-in-chief, and was therefore improper rebuttal. He did not raise this objection at trial, and the claim is therefore forfeited on appeal. (See *People v. Williams* (1976) 16 Cal.3d 663, 667, fn. 4 ["It is the general rule . . . that questions relating to the admissibility of evidence will not be reviewed on appeal absent a specific and timely objection at trial on the ground sought to be urged on appeal"].)

On the merits, it is improper for a prosecutor to withhold "crucial evidence properly belonging in the case-in-chief" (*Friend*, *supra*, 47 Cal.4th at p. 44; see also *People v. Carter* (1957) 48 Cal.2d 737, 753), and to present it in rebuttal to take unfair advantage of a defendant. Here, the information contained a special

36

circumstance allegation that defendant Satele intentionally killed the victims because of their race, and enhancement allegations that he committed the murders in concert because of race, although the jury ultimately found the allegations not true. (§ 190.2, subd. (a)(16), § 422.75, former subd. (c), now subd. (b).) Although evidence that Satele had without apparent provocation assaulted a Black inmate was relevant to these allegations, it cannot properly be characterized as "crucial evidence" on the issue of his racial animus. Moreover, any error in admitting Deputy Arias's testimony on rebuttal was harmless under any standard, because the jury found not true the hate crime special circumstances and the allegations that Satele committed the murders in concert because of race.

Defendant Satele contends that Deputy Arias's testimony that Satele attacked a Black inmate had little probative value in rebutting testimony by defense witnesses that he got along well with Blacks, because the prosecution offered no evidence that the attack was racially motivated. By contrast, he argues, the testimony was unduly prejudicial because it showed his commission of a crime and tended to demonstrate his future dangerousness. Thus, he reasons, the trial court should have sustained his objection to the testimony on the ground that its potential prejudicial effect outweighed its probative value. (Evid. Code, § 352.) We disagree. Deputy Arias testified that Satele, without warning and completely without provocation, attacked a defenseless Black inmate. Because the attack resembled the murders with which defendants were charged, which also occurred in an unprovoked attack on defenseless Black victims, the jury could infer that it was racially motivated. The prejudicial effect of the assault, in which the inmate was apparently not seriously hurt, was minimal when contrasted to the murders with which Satele was charged. Thus, the trial court did not abuse its broad discretion under Evidence Code section 352 when it ruled that the probative value

37

of Deputy Arias's testimony about the attack was not substantially outweighed by its prejudicial effect.

Defendant Satele contends that the trial court erred by failing to state that it had weighed the probative value and prejudicial effect of Deputy Arias's testimony when it overruled his objection to the evidence. He is wrong: A trial court is not required to " 'expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing function under Evidence Code section 352.' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1285.) Here, the record shows that the trial court properly performed this task. Indeed, the trial court had previously precluded the prosecutor from asking Demery, the husband of defendant Satele's cousin, about the incident on cross-examination in the defense case because the court found its probative value was outweighed by its prejudice. (See p. 35, *ante*.)

### 3. *Asserted prosecutorial misconduct*

Both defendants contend that the prosecutor committed misconduct during closing argument.

"A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact." (*People v. Avila* (2009) 46 Cal.4th 680, 711.) "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*Samayoa*, *supra*, 15 Cal.4th at p. 841.)

### a. Asserted vouching by the prosecutor

Here, in closing argument to the jury, the prosecutor said: "He [Ernie Vasquez] identified Curly [Caballero] as the driver of that Buick. Isn't it amazing that Curly just happened to be with Speedy and [Wilbone] earlier and it was brought out that he was with them later, that Ernie Vasquez hit the nail on the head? He identified Curly. What a coincidence. Because *I guarantee that is the truth*. What he testified to was corroborated." (Italics added.) Defendant Nunez objected to the "district attorney's guarantee that is the truth." The trial court said: "Your objection is improper argument. Please make a legal basis. Sustained. Carry on." Defendants did not request an admonition.

In defendant Satele's closing argument, his counsel asserted that much of the tape recording of defendants' conversation while they were being transported in the van to and from court (see pp. 4-5, *ante*) was inaudible. In rebuttal, the prosecutor said: "[A]ll you have to do is listen to his own words. Listen to Daniel Nunez'[s] own words track 2 at 2250, you will hear[.] [D]efendant's counsel says you can't hear this stuff on the CD. You will hear it. I will back up my words. You will hear this. You will hear him say, I want Black and then he thinks a – no Blacks. . . . What does that tell you about his feeling? We know what's going on in this mind of his. They can't justify it. The only way they can justify it you won't hear that on the CD. *I will stake my reputation on it*. You listen [to] that tape, that CD at that point, and you will hear it." (Italics added.) The trial court sustained defendant Nunez's objection to the "guarantee by the district attorney." Defendants did not ask the court to admonish the jury to disregard the comment. The prosecutor later said, "[W]hen I was talking about the CD tape and transcript, you listen to it. . . . I shouldn't say I sta[k]e my reputation. You be the judge[.] [Y]ou . . . . [l]isten you . . . judge for yourself."

39

Defendants contend that the prosecutor's comments were misconduct because he relied on his personal beliefs. (See *People v. Medina* (1995) 11 Cal.4th 694, 776 ["prosecutors should not purport to rely in jury argument on their outside experience or personal beliefs based on facts not in evidence"].) Defendants failed to seek an admonition as to either statement, no exception to the general rule requiring a request for admonition is applicable, and the claim is therefore forfeited on appeal. (*Samayoa*, *supra*, 15 Cal.4th at p. 841.) Moreover, the comments were not prejudicial: In both instances, the prosecutor explained that the evidence in the record supported his view, the trial court sustained defense objections to the challenged comments, and the prosecutor later told the jury as to his argument about the CD, "I shouldn't say I sta[k]e my reputation."

### b. Asserted inconsistent arguments

Defendant Satele asserts the prosecutor committed misconduct when, after arguing at the guilt phase that he did not know and had not proven who fired the murder weapon, he argued at the penalty phase that defendant Satele was the shooter. Satele claims that as "a result of this shift in theory, the prosecutor used facts to increase [Satele's] culpability without proving those facts first in the guilt phase."

At the guilt phase, the prosecutor said in closing argument to the jury: "You heard the testimony of Julie Rodriguez . . . [about] what they do when they commit driveby murders like this. They have a driver, they have a shooter, and they have people in the back to look for law enforcement, to look for witnesses. . . . I will be the first one to tell you that I did not prove to you who the actual shooter was. Whether it was defendant Nunez or defendant Satele. But you know they were in the car. An[d] whether they're in the backseat, the front seat, the driver's seat, all three of those individuals knew what was going down that day

40

and participated in this murder." The prosecutor later argued: "What happened? We know at that point the Buick Regal . . . is going southbound on Frampton. Curly [Caballero] is driving — from the evidence, remember, Ernie [Vasquez] thought [defendant Satele] was in the front passenger seat. . . . [T]he person in the rear he thought looked like Speedy [defendant Nunez], or he resembled Speedy. So let's go with it that way."

At the penalty phase, the prosecutor in closing argument to the jury discussed the mitigating factor described in section 190.3, factor (j), which allows a jury to consider, in deciding whether to impose a sentence of death, "[w]hether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor." The prosecutor said: "[W]hat were the roles of the defendants in the murdering of Edward and Renesha? . . . . Neither of these defendants . . . had a role which was minor. They were all major participants in this crime. . . . You . . . remember Ms. Rodriguez told you what happens in a driveby shooting." He noted that Vasquez had testified the driver was Caballero, and that as for the person in the passenger seat who was the shooter, the prosecutor argued: "The evidence . . . points to defendant Satele." The prosecutor said that Contreras had heard defendant Satele say, "I shot the Black guy and that Black girl," and reminded the jury of Vasquez's testimony that the person in the passenger seat resembled Satele, and the person in the backseat resembled defendant Nunez. The prosecutor then asserted that even if defendant Nunez was in the backseat, his role as a lookout for the police and for any witnesses was not minor.

Defendant Satele did not object to the prosecutor's argument at the penalty phase or seek an admonition, and no exception to the general rule requiring an objection and admonition request is applicable. The claim is therefore forfeited. (*Samayoa*, *supra*, 15 Cal.4th at p. 841.) It is also meritless because the arguments

41

at the guilt and penalty phases were not inconsistent. Rather, at both phases of trial the prosecutor observed that the evidence, although inconclusive, indicated that defendant Satele was most likely the shooter. At the penalty phase the prosecutor simply sought to persuade the jury that if it found defendant Nunez was in the backseat of the vehicle, this did not mean his participation was minor within the meaning of section 190.3, factor (j). No misconduct occurred.

### 4. Challenge to gang enhancement instruction

#### a. Factual background

The prosecution alleged, as sentence enhancements to the murders charged in counts 1 and 2 of the amended information, that defendants committed the murders in violation of section 186.22's subdivision (b)(1) (section 186.22(b)(1), sometimes referred to as the gang enhancement). The gang enhancement provides for an increased sentence when the underlying felony was committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*Ibid.*)

At trial, the prosecution presented evidence that West Side Wilmas gang members other than defendants had committed crimes. Detective Dinlocker testified that Ruben Figueroa and Brian Dominic Martinez were West Side Wilmas gang members, and the prosecution introduced records of Martinez's conviction for assault with a firearm and Figueroa's convictions for murder and assault with a deadly weapon.

During the guilt phase instruction conference, the trial court proposed to instruct the jury with CALJIC No. 6.50, stating that this instruction concerned the "gang crime." CALJIC No. 6.50 does not describe the elements of the gang *enhancement* with which defendants were charged, set forth in section

186.22(b)(1); instead, it gives the elements of a *crime* described in section 186.22's subdivision (a) (hereafter the gang crime), which makes it a felony to "actively participate[] in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity."

Defendant Satele's counsel said he did not object to the proposed instruction. The prosecutor argued that the "pattern of criminal gang activity" described in the instruction should include what he referred to as Brian Dominic Martinez's conviction for assault with a deadly weapon,[3] and Ruben Figueroa's convictions for murder and assault with a deadly weapon. In response, Nunez's counsel unsuccessfully objected that the evidence did not show "the necess[ary] requirement[s]," presumably for the pattern of gang activity.

When the trial court read CALJIC No. 6.50 to the jury, it began: "Defendant is accused in counts one and two of having violated section 186.22(a) of the Penal Code, a crime. Every person who actively participates . . . is guilty of the violation of Penal Code section 186.22(a), a crime." The prosecutor asked, "That should be subdivision b, as in boy?" The court replied, "I'm sorry, subdivision b." The court then repeated this portion of the instruction, inserting the letter "(b)" instead of "(a)" throughout.[4] In the written instructions, which the jury received, the "(a)" in "section 186.22, subdivision (a)" was replaced by hand with "(b)."

---

[3]  Martinez was actually convicted of assault with a firearm (§ 245, subd. (a)(2)), not assault with a deadly weapon (§ 245, subd. (a)(1)).

[4]  The trial court instructed the jury: "Defendant is accused in counts one and two of having violated section 186[].22(b) of the Penal Code, a crime. Every person who actively participates in any criminal street gang with knowledge that the members are engaged in or have engaged in a pattern of criminal gang activity, and who willfully promotes[,] furthers[,] or assists in any felonious criminal conduct by members of that gang is guilty of the violation of Penal Code section 186.22(b[])[,] [a] crime. [¶] 'Pattern of criminal gang activity' means the commission of or attempted commission or solicitation of sustained juvenile

*(footnote continued on next page)*

In his closing argument, the prosecutor asserted: "[T]here's an allegation which we proved under 186.22 called a gang allegation, that this crime was committed for the benefit of West Side Wilmas. And it was." The prosecutor also said that under the gang allegation he was required to prove several elements, including a pattern of criminal gang activity. To do so, he relied on Figueroa's murder and assault with a deadly weapon convictions, and Martinez's "assault with a firearm, which is a deadly weapon" conviction. He also asserted: "The last element of that gang allegation is that this crime was committed for the benefit of that gang. You heard me question Julie Rodriguez. She testified it was, in her opinion. You also can see it from People's 43 [which included a photograph of

*(footnote continued from previous page)*

petition for, or conviction of two or more of the following crimes, namely murder and assault with [a] deadly weapon, provided at least one of those crimes occurred after September 23, 1988, and the last of those crimes occurred within three years after a prior offense, and the crimes are committed on separate occasions [or] by two or more persons. [¶] 'Criminal street gang' means any ongoing . . . association or group of three or more persons[,] whether formal or informal, having as one of [its] primary activities, 1. the commission of one or more . . . of the following criminal acts, murder and assault with a deadly weapon; 2. having a common name or common identifying sign or symbol; and 3. whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity. [¶] Active participation means that the person, 1. must have a current relationship with the criminal street gang that is more than in name only[,] passive, inactive or purely technical, and 2. must devote all or a substantial part of his time or efforts to the criminal street gang. [¶] Felonious criminal conduct includes murder and assault with [a] deadly weapon. In order to prove this crime each of the following elements must be proved: 1. A person actively and currently participates in a criminal street gang; 2. The members of that gang engage in or have engaged in a pattern of criminal gang activity; 3. That person knew that the gang members engaged [in] or have engaged in a pattern of criminal gang activity; and 4. That person aided and abetted a member of that gang in committing the crimes of murder and assault with [a] deadly weapon." (See CALJIC No. 6.50 (6th ed. 1999 rev.).)

44

graffiti] [and] from the actions of Wilbone against Mr. Keys that they did this to promote their gang." The jury found the gang enhancement allegations to be true.

### b. Analysis

Defendants contend that the gang enhancement findings should be vacated because the trial court committed prejudicial error by instructing the jury on the elements of the gang *crime* (§ 186.22, subd. (a)) when they were charged with the gang *enhancement* (§ 186.22(b)(1)). We agree.

The trial court's instruction (see p. 43, fn. 4, *ante*) told the jury that the charged gang enhancements (erroneously referred to by the instruction as "crimes") contained four elements: "1. A person actively and currently participates in a criminal street gang; 2. The members of that gang engage in or have engaged in a pattern of criminal gang activity; 3. That person knew that the gang members engaged [in] or have engaged in a pattern of criminal gang activity; and 4. That person aided and abetted a member of that gang in committing the crimes of murder and assault with [a] deadly weapon." This list omitted two elements of the gang enhancements charged in the amended information. First, the instruction did not tell the jury that to find the enhancements true, it must find that defendants committed the murders "for the benefit of, at the direction of, or in association with any criminal street gang" (§ 186.22(b)(1)); second, the instruction did not tell the jury that to find the enhancements true, it must find that defendants committed the murders "with the specific intent to promote, further, or assist in any criminal conduct by gang members" (*ibid*.).

The Attorney General claims that the jury was adequately instructed on the elements of the gang enhancements. As explained below, her arguments are not persuasive.

45

As to the element that the crimes charged were committed for the benefit of, at the direction of, or in association with a criminal street gang, the Attorney General notes that the instruction required that the jury find "active participation" in a criminal street gang, which the instruction defined as "a current relationship with the criminal street gang that is more than in name only[,] passive, inactive or purely technical," in which the defendant devoted "all or a substantial part of his time or efforts" to the gang.[5] She asserts that this portion of the instruction — together with the reasonable doubt instruction and the instruction to consider the instructions as a whole — required the jury "to deduce that to find the gang charges true, there had to be proof beyond a reasonable doubt that [defendants] . . . committed the murders 'in association with' their gang." But there is a reasonable likelihood that the jury would not have understood the instruction as requiring it to make such a finding. The portion of the instruction concerning active participation simply addresses a defendant's level of involvement with the street gang, not whether the defendant *committed the charged crimes* for the benefit of, at the direction of, or in association with a criminal street gang.

The Attorney General asserts that the trial court's instruction said, in essence, that the jury could consider proof that the defendants committed the charged murders as evidence of a "pattern of gang activity." According to the Attorney General, this portion of the instruction, considered in combination with the reasonable doubt instruction, told the jury it could find the gang enhancements true only if it found "evidence beyond a reasonable doubt that the charged murders

---

**5** After the trial in this case, we held that the language "actively participates in any criminal street gang" in section 186.22(a) means "involvement with a criminal street gang that is more than nominal or passive." (*People v. Castaneda* (2000) 23 Cal.4th 743, 747.)

were committed for the 'benefit of, at the direction of, or in association with' the defendant's gang." This argument mischaracterizes the instruction. The portion of the instruction mentioned by the Attorney General did not mention the charged murders; rather, it told the jury it could consider "murder and assault with [a] deadly weapon" as evidence of a " 'pattern of criminal gang activity.' " But the prosecutor expressly relied on the convictions of Figueroa and Martinez for murder and assault with a deadly weapon — and not the charged murders — to show the requisite pattern of activity. Moreover, even if the jury understood this portion of the instruction as referring to the charged murders as well as those convictions, the instruction did not tell the jury that it *must* find that the charged murders were gang related in order to find the enhancements true.

The Attorney General argues that the trial court's instruction told the jury to find each gang enhancement true only if the evidence showed "beyond a reasonable doubt that the defendant 'aided and abetted' a fellow gang member in committing the charged murder." The Attorney General is incorrect. The court instructed the jury that "[i]n order to prove this crime" (by which the court meant the gang enhancements), several elements "must be proved," one of which was that a "person aided and abetted a member of that gang in committing the crimes of murder and assault with [a] deadly weapon." The prosecutor expressly relied on the convictions of Figueroa and Martinez for murder and assault with a deadly weapon to show a pattern of criminal gang activity, and the phrase "murder and assault with [a] deadly weapon" was repeated throughout the instruction. There is a reasonable likelihood that the jury interpreted this phrase as referring only to those convictions; indeed, defendants were not charged with assault with a deadly weapon. Nor is it dispositive that the prosecutor asserted "[t]he last element of that gang allegation is that this crime was committed for the benefit of that gang." The court had already instructed the jury before closing argument that "[i]f

47

anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions."

As to the specific intent element of section 186.22(b)(1) (that is, the requirement that the prosecution prove that the charged crimes were committed with the specific intent to promote, further, or assist in any criminal conduct by gang members), the Attorney General contends this element was adequately addressed when the trial court instructed the jury that the enhancement required proof that a defendant "*willfully* promote[d][,] further[ed][,] or assist[ed] in any felonious criminal conduct by members of that gang." (Italics added.) Although the Attorney General acknowledges that " 'willfully' in a penal statute usually defines a general criminal intent" (*People v. Atkins* (2001) 25 Cal.4th 76, 85), she asserts that here " 'willfully' meant an intent to do a further act or achieve a future consequence, i.e., promoting, furthering, or assisting felonious criminal conduct by fellow gang members through active participation." "Active participation," the Attorney General continues, was defined as "devot[ing] all or a substantial part of [one's] time or efforts to the criminal street gang." Thus, she contends, the court "adequately instructed the jury that 'willfully' meant an intent to do a further act or achieve a future consequence beyond the charged murder, i.e., specific intent." But the trial court here defined "[f]elonious criminal conduct" as including "murder and assault with [a] deadly weapon," and there is a reasonable likelihood the jury understood this language to refer to the convictions of Figueroa and Martinez for murder and aggravated assault, not the murders charged in this case. Thus, regardless of the meaning of the word "willfully," the court's instructions did not require the jury to decide whether *the murders charged in this case* were committed with the requisite specific intent.

48

The Attorney General asserts that the trial court's instruction told the jury that "there must be proof that the [defendant] 'aided and abetted' a fellow gang member in committing the murder," and that the "mental state required for liability as an aider and abettor is 'specific intent.' " The Attorney General is wrong. The court instructed the jury that the gang crime contained several elements that "must be proved," one of which was that the defendant "aided and abetted a member of that gang in committing the crimes of murder and assault with [a] deadly weapon." As previously explained (see p. 47, *ante*), this language appears to refer to the murder and assault with a deadly weapon convictions of Figueroa and Martinez, not to the murders in this case. Thus, there is a reasonable likelihood that the jury construed the instruction as not requiring it to find that defendants committed the charged murders with the specific intent to promote, further, or assist in any criminal conduct by gang members. (See *People v. Jennings* (2010) 50 Cal.4th 616, 676-677 [evaluating trial court error in omitting the actus reas requirement of the torture-murder special-circumstance by assessing the instructions as a whole to determine " 'if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner' "].)

We therefore conclude the trial court erred in instructing the jury on the gang enhancement, and turn to the issue of prejudice, which is a question of state law. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 320-321, 327.)[6] To determine

---

[6]    Recently, in *Alleyne v. United States* (June 17, 2013, No. 11-9335) __ U.S. __, __ [2013 U.S. Lexis 4543, at pp. *8-*9, *15-*16], the United States Supreme Court held that the federal Constitution's Sixth Amendment entitles a defendant to a jury trial, with a beyond-a-reasonable-doubt standard of proof, as to "any fact that increases the mandatory minimum" sentence for a crime. But because the gang enhancements on which the trial court here misinstructed the jury did not increase the mandatory minimum sentence for the murders committed by defendants, *Alleyne* does not alter our conclusion that the court's instructional

*(footnote continued on next page)*

49

whether the error was prejudicial under state law, we must assess whether it is reasonably probable that a result more favorable to defendants would have been reached had the jury been correctly instructed, examining the entire record, " 'including the facts and the instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict.' " (*People v. Wims* (1995) 10 Cal.4th 293, 315, overruled on other grounds in *Sengpadychith*, *supra*, at p. 326, quoting *People v. Guiton* (1993) 4 Cal.4th 1116, 1130.)

Here, the trial court did not instruct the jury on *any element* required under section 186.22(b)(1). Thus, the jury was not instructed that to find the enhancement allegations true, it must find that defendants committed the murders "for the benefit of, at the direction of, or in association with any criminal street gang" (§ 186.22(b)(1)). Nor was it instructed that it must find that defendants committed the murders "with the specific intent to promote, further, or assist in

_____

*(footnote continued from previous page)*

error violated only state law. In October 1998, when the murders in this case were committed, the finding of a gang enhancement as to a felony punishable by imprisonment for life resulted in the defendant being ineligible for parole until serving "a minimum of 15 calendar years" in prison. (Former § 186.22, subd. (b)(4); as amended by Stats. 1997, ch. 500, § 2, p. 3125.) By contrast, the crime to which the gang enhancements apply here — first degree murder — was punishable by death, by imprisonment for life without the possibility of parole, or by a prison term of "25 years to life" (§ 190, subd. (a)), for which the defendant was ineligible for parole before serving a minimum of *25 years* in prison (§ 190, subd. (e); Stats. 1997, ch. 413, §§ 1, 4, pp. 2756, 2758, added by Prop. 222, as approved by voters, Primary Elec. (June 2, 1998) eff. June 3, 1998). Thus, the gang enhancement's mandatory minimum sentence of *15* years did not increase the statutory minimum sentence for the murders. As a result, the trial court's instructional error as to the gang enhancement did not violate defendants' Sixth Amendment right to jury trial.

any criminal conduct by gang members." (*Ibid*.) Furthermore, as we have explained, no other instruction addressed these elements.

The most important difference between the gang *enhancement* alleged against defendants and the gang *crime* on which they were instructed is that, unlike the gang crime, the gang enhancement can be found true only if the underlying felony to which the enhancement applies — here, the two murders committed by defendants — is itself gang related. (See *People v. Livingston* (2012) 53 Cal.4th 1145, 1170 ["[T]he enhancement applies 'only if the crime is "gang related." ' [Citation.] 'Not every crime committed by gang members is related to a gang.' "].) Both defendants in this case were indisputably members of a criminal street gang (the West Side Wilmas), but, as discussed below, the evidence did not clearly show that the murders were gang related.

The prosecution theorized that the murders were gang related because they were racially motivated. Los Angeles Police Officer Julie Rodriguez, testifying as a gang expert who specialized in the West Side Wilmas gang, explained that in her opinion the West Side Wilmas "don't care for African Americans living in" their territory, and that "they don't want any African Americans to share the neighborhood with them." Defendants, in her view, believed that "eliminating African Americans within their community" would "better the gang," which had an "unwritten rule" that gang members must take advantage of "any opportunity that they have . . . to attack an African American."

The prosecution presented considerable evidence that the murders were racially motivated: Prosecution witnesses testified that both defendants had described the victims after the murders with words strongly suggesting prejudice against African-Americans, and that shortly after the murders defendant Satele said that defendants had been "out looking for niggers." The jury, however, *rejected* the prosecution's theory of a racially motivated killing, because it found

51

special circumstance allegations that defendants intentionally killed the victims because of their race not to be true.  By rejecting this theory, the jury implicitly rejected the prosecution's theory — described in the previous paragraph — that the killings were gang related because they were racially motivated.

Prosecution witness Ernie Vasquez testified that defendant Nunez told him that Nunez had been driving down the street when one of the victims "looked at him wrong," so Nunez "turned back around and blasted" the victim.  This testimony, if credited by the jury, could have caused it to conclude that the murders were *not* gang-related, racially motivated killings.  Thus, if the jury had been properly instructed that it could find the gang enhancements true only if it found that defendants committed the murders "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" (§ 186.22(b)(1)), the jury might well have found the gang enhancement allegations not to be true.

Because, for the reasons described above, there is "serious doubt as to whether the error has affected the result" (*People v. Watson* (1956) 46 Cal.2d 818, 837), the trial court's instructional error pertaining to the gang enhancement allegations was prejudicial.  We therefore vacate the gang enhancement findings for each defendant.

### 5. *Challenge to firearm use enhancement true findings*

Defendants contend that we must vacate the jury's true findings on the sentence enhancement allegations for personal firearm use, because those findings depended on the jury first finding true the gang enhancement allegations, on which the jury was erroneously instructed.  (See pt. II.B.4, *ante*.)  We agree.

As to each defendant, the amended information alleged firearm use enhancements under former section 12022.53's subdivision (d) (section 12022.53(d)) for both murders.[7] The trial court instructed the jury that the "allegation pursuant to Penal Code section 12022.53(d) applies to any person charged as a principal in the commission of an offense, when a violation of Penal Code section 12022.53(d) and 186.22(b) are pled and proved." During closing argument to the jury, when discussing the firearm use allegations, the prosecutor said: "I told you . . . that I did not prove to you which of the two defendants personally used a gun. So you're going to say, 'I'm going to find that allegation not true, because [the prosecutor] did not prove who personally shot the gun.' But if you look in that instruction . . . there's a paragraph that . . . says . . . that gang members are vicariously liable. They are all liable for that personal use if that gun has been intentionally discharged and proximately caused death and there is a gang allegation that has been pled and proven. I've told you I pled and proved

---

[7] At the time of the murders, section 12022.53 provided in relevant part:

"(d) Notwithstanding any other provision of law, any person who is convicted of a felony specified in subdivision (a) [murder is a specified felony], . . ., and who in the commission of that felony intentionally and personally discharged a firearm and proximately caused great bodily injury, . . . or death, to any person other than an accomplice, shall be punished by a term of imprisonment of 25 years to life in the state prison, which shall be imposed in addition and consecutive to the punishment prescribed for that felony.

"(e)(1) The enhancements specified in this section shall apply to any person charged as a principal in the commission of an offense that includes an allegation pursuant to this section when a violation of both this section and subdivision (b) of Section 186.22 are pled and proved.

"(2) An enhancement for participation in a criminal street gang pursuant to Chapter 11 (commencing with Section 186.20) of Title 7 of Part 1, shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense." (As amended by Stats. 1998, ch. 936, § 19; see *id.*, §§ 19.5, 27, 36, pp. 6899-6900, 6919, 6922.)

that, because I proved that Dominic Martinez, Ruben Figueroa — we had Julie Rodriguez. So that gang allegation is proven. Because of that gang allegation, they are both liable for that personal use of the gun. So I don't want that word 'personal' to throw you off. When you go back there and it says, 'We, the jury, find the allegation that the defendants personally, intentionally used a firearm . . . to be true or not true,' please circle the true."

The trial court's instructions and the prosecutor's argument relieved the jury of the obligation to determine who personally used the murder weapon if it found true the gang enhancement allegations under section 186.22(b)(1). Although the jury may have found that one or both defendants personally used the murder weapon, the instructions permitted the jury to simply conclude that because it had found the gang enhancement allegations to be true, it did not need to decide who personally used the weapon; indeed, the prosecutor specifically urged the jury to adopt this approach. Thus, we cannot tell whether the jury found the section 12022.53(d) allegations true because it found true the section 186.22(b)(1) allegations (a legally invalid theory because the jury was misinstructed on the elements of the gang enhancement allegations) or because it found that each defendant personally shot the two victims (a legally valid theory). We therefore vacate the firearm use findings as to both defendants. (See *People v. Chun* (2009) 45 Cal.4th 1172, 1203 ["to find the error harmless, a reviewing court must conclude, beyond a reasonable doubt, that the jury based its verdict on a legally valid theory"]; *People v. Green* (1980) 27 Cal.3d 1, 69, 71, 74 [kidnapping conviction reversed and special circumstance finding vacated when this court could not tell whether the jury based its verdict on a legally invalid theory]; see also *People v. Guiton*, *supra*, 4 Cal.4th at p. 1128 ["cases involving a '*legally* inadequate theory' " are "subject to the rule generally requiring reversal"].) As a result, we need not address defendants' further arguments that the trial court

54

misinstructed the jury on liability under section 12022.53(d), and that the jury's findings on the firearm use allegations were factually inconsistent.

### 6. *Instruction on culpability of an aider and abettor*

The trial court instructed the jury: "Persons who are involved in committing a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is *equally guilty*. Principals include: those who directly and actively commit the act constituting the crime, or those who aid and abet the commission of the crime." (Italics added; see CALJIC No. 3.00.)

Relying on *People v. McCoy* (2001) 25 Cal.4th 1111 (*McCoy*), and *People v. Concha* (2009) 47 Cal.4th 653 (*Concha*), both defendants contend that the use of the term "equally guilty" in the trial court's instruction was erroneous because an aider and abettor's culpability, although based on the acts of the principals, is also based on the aider and abettor's own mental state. Therefore, they assert, the culpability of an aider or abettor can sometimes be either greater or less than, but not equal to, the culpability of the direct perpetrator, and the jury should have been so instructed. Defendants are not entitled to reversal on this ground.

In *McCoy*, *supra*, 25 Cal.4th at page 1120, we observed that by making "aiders and abettors liable for their accomplices' actions as well as their own," the aider and abettor doctrine "obviates the necessity to decide who was the aider and abettor and who the direct perpetrator or to what extent each played which role." We noted that "outside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator." (*Id*. at p. 1118.) When the crime is murder, *McCoy* said, the "aider and abettor must know and share the murderous intent of the actual perpetrator." (*Ibid.*) Because an aider and abettor's "guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state" (*id.* at

p. 1117), *McCoy* also held that "sometimes" an "aider and abettor may be guilty of greater homicide-related offenses than those the actual perpetrator committed" because of "defenses or extenuating circumstances . . . that are personal to the actual perpetrator and do not apply to the aider and abettor." (*Id*. at p. 1114.)[8] In *Concha*, two codefendants and an accomplice tried to murder a man during an apparent robbery, and the man responded by killing the accomplice. (*Concha*, *supra*, 47 Cal.4th at p. 658.) We held that each defendant could be liable for the first degree murder of the accomplice under the "provocative act murder doctrine" only "if the defendant *personally* acted willfully, deliberately, and with premeditation during the attempted murder." (*Ibid*., italics added.)

Here, however, neither defendant asserts a defense theory or points to extenuating circumstances that might have led the jury to find that one defendant's individual culpability was less than that of the other defendant, nor does the evidence at trial suggest any such defense or circumstances. Rather, defendants simply speculate that they "may have had different levels of culpability." Under the circumstances, there is no reasonable likelihood that the jury was confused or misled by the trial court's instruction that the aider and abettor and the direct perpetrator were "equally guilty."

---

[8]    Following our decision in *McCoy*, *supra*, 25 Cal.4th 1111, CALJIC No. 3.00 was modified for cases in which there is evidence that the guilt of the aider and abettor might be different from that of the direct perpetrator. In those circumstances, the current instruction substitutes the language "guilty of a crime" for the language "equally guilty," and further provides: "When the crime charged is [either] [murder] [or] [attempted murder] . . . , the aider and abettor's guilt is determined by the combined acts of all the participants as well as that person's own mental state. If the aider and abettor's mental state is more culpable than that of the actual perpetrator, that person's guilt may be greater than that of the actual perpetrator. Similarly, the aider and abettor's guilt may be less than the perpetrator's, if the aider and abettor has a less culpable mental state." (*Ibid.*)

## 7. *Challenge to multiple-murder special-circumstance instruction*

The trial court instructed the jury that if it found that either defendant was an accomplice to the murders but was not the actual killer, or if it was unable to decide whether a defendant was the actual killer or an aider and abettor, it could not find the multiple-murder special-circumstance allegations true as to that defendant unless he acted with either one of two mental states: (1) the "defendant with the intent to kill aided, abetted, counseled, commanded[,] induced, solicited, requested, or assisted any actor in the commission of the murder in the first degree" or (2) the defendant "with reckless indifference to human life and as a major participant aided, abetted, counseled, commanded, induced[,] solicited[,] requested, or assisted in the commission of the crime of Penal Code section 190.2(a)(3) . . . which resulted in the death of a human being." Both defendants contend that the trial court prejudicially erred in giving the second portion of this instruction because it permitted the jury to find the multiple-murder special-circumstance allegations true as to a defendant who was not the actual killer without finding that the defendant acted with the intent to kill.[9] We agree that the

_____

[9]    This was the instruction given by the trial court on the multiple-murder special-circumstance allegations: "If you find a defendant in this case guilty of murder of the first degree, you must then determine if one or more of the following special circumstances are true or not true . . . .  Unless an intent to kill is an[] element of a special circumstance, if you are satisfied beyond a reasonable doubt that the defendant actually killed a human being, you need not find that the defendant intended to kill in order to find the special circumstance to be true.  If you find that the defendant was not the actual killer of . . . a human being, or if you are unable to decide whether the defendant [w]as the actual killer, or an aider and abettor or co-conspirator, you cannot find the special circumstance to be true as to that defendant unless . . . [you are] satisfied beyond a reasonable doubt that such defendant with the intent to kill aided, abetted, counseled, commanded[,] induced, solicited, requested, or assisted any actor in the commission of the murder in the first degree, *or with reckless indifference to human life and as a major participant aided, abetted, counseled, commanded, induced[,] solicited[,]*

*(footnote continued on next page)*

57

trial court misinstructed the jury as to the intent requirement for aiders and abettors, but we conclude the error was harmless.

When there is evidence from which a jury could base its convictions for multiple counts of murder on the theory that the defendant was guilty as an aider and abettor, and not as the actual perpetrator, the trial court must instruct the jury that to find true a multiple-murder special-circumstance allegation as to that defendant, it must find that the defendant intended to kill the murder victims. (§ 190.2, subds. (b)-(c); *People v. Hardy* (1992) 2 Cal.4th 86, 192 (*Hardy*).) A murderer who was not the actual killer and who lacked the intent to kill, but acted "with reckless indifference to human life and as a major participant," can be subject to a punishment of either death or life imprisonment without the possibility of parole only when the prosecution alleges, as a special circumstance, that the murder occurred in the commission of certain felonies specified in section 190.2's subdivision (a)(17). (§ 190.2, subd. (d).) Contrary to the trial court's instruction to the jury here, this rule does not apply to the multiple-murder special circumstance. An erroneous instruction on the intent to kill element of a special circumstance, however, "does not require reversal if a reviewing court concludes . . . that the error is harmless beyond a reasonable doubt." (*Hardy*, at p. 192; see *People v. Garrison* (1989) 47 Cal.3d 746, 789 (*Garrison*).) We so conclude here.

---

*(footnote continued from previous page)*

*requested, or assisted in the commission of the crime of Penal Code section 190.2(a)(3) . . . which resulted in the death of a human being, namely Edward Robinson and Renesha Ann Fuller.* A defendant acts with reckless indifference to human life when that defendant knows or is aware that his acts involve a grave risk of death to an[] innocent human being." (Italics added.)

58

In *Hardy*, *supra*, 2 Cal.4th 86, this court held that the trial court's failure to instruct on the intent to kill element of the multiple-murder special-circumstance allegation in that case was harmless because the court instructed the jury that if the defendant was not the actual killer, " 'it must be proved beyond a reasonable doubt that he *intentionally aided* [and] abetted . . . the actual killer in the commission of the murder in the first degree.' " (*Id*. at p. 192.)  In addition, in *Hardy*, the jury found true the financial-gain special-circumstance allegation, which expressly required it to find the killing was intentional.  We observed that "in combination, these instructions required the jury to find either that [the defendant] himself was the actual killer, or that he intentionally aided the actual killer in an intentional killing." (*Ibid*.)

Likewise in *Garrison*, *supra*, 47 Cal.3d 746, the trial court failed to instruct the jury on the intent to kill requirement for a multiple-murder special-circumstance finding as to an aider and abettor.  (*Id*. at p. 789.)  We held the error was harmless because the jury also found true a witness-killing special-circumstance allegation, which required a finding that the witness was killed intentionally.  (*Id*. at p. 790.)  We also noted that the deficiencies in the aiding and abetting instructions were ameliorated because the defendant at trial denied he in any way aided in the killing, leaving "no way for the jury to find that he 'aided' the killing only 'accidentally' or 'unintentionally.' " (*Id*. at p. 790; see *id.* at pp. 776-777.)

Here, as in *Hardy*, *supra*, 2 Cal.4th 86, and *Garrison*, *supra*, 47 Cal.3d 746, the jury necessarily found under other properly given instructions that any defendant that it convicted of murder on a theory of aiding and abetting possessed the intent to kill.  The instructions here permitted the jury to convict a defendant of murder as an aider and abettor only if it found that the defendant, "with knowledge of the unlawful purpose of the perpetrator" (i.e., to kill the victims), and "with the

59

intent or purpose of committing or encouraging or facilitating the commission of the crime" (i.e., the killing of the victims), "by act or advice aid[ed], promote[ed], encourage[d] or instigate[d] the commission of the crime." The trial court further instructed the jury that aiding and abetting liability was not demonstrated by "[m]ere presence at the scene of the crime which does not itself assist the commission of the crime," or "[m]ere knowledge . . . that a crime is being committed and a failure to prevent it." These instructions told the jury that an aider and abettor's murder conviction could not be based on mere knowledge of the perpetrator's intent to kill; rather, the jury was also required to find that the aider and abettor shared that purpose or intent. (See *People v. Beeman* (1984) 35 Cal.3d 547, 560 ["an aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime"].)

The evidence at trial demonstrated that murder victims Fuller and Robinson suffered their fatal injuries when they were each hit by multiple shots fired in a driveby shooting by a perpetrator using an AK-47-type assault rifle loaded with armor-penetrating bullets. These circumstances demonstrate that the actual perpetrator acted with the intent to kill, and did not kill accidentally or inadvertently. As previously noted (see pp. 55-56, *ante*), defendants do not assert, and the evidence at trial does not reveal, any defense or extenuating circumstances that might have warranted a finding by the jury that one defendant's individual culpability was less than that of the other defendant. On these facts, and given the instructions described in the previous paragraph, the jury here must necessarily have found that any defendant that it convicted of murder as an accomplice acted with the intent to kill.

### 8. *Trial court's failure to instruct on its own motion on implied malice murder*

The trial court instructed the jury that to constitute murder a killing must be unlawful and done with malice aforethought, and it defined both express and implied malice. The court then instructed the jury on three forms of first degree murder: premeditated and deliberate murder, murder by knowing use of armor-penetrating ammunition, and murder by intentionally discharging a firearm from a motor vehicle. The court further instructed the jury that "murder of the second degree is . . . the unlawful killing of a human being with malice aforethought . . . if [the] perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation."

Both defendants argue that, in addition to instructing the jury on one type of second degree murder — an unlawful killing with intent to kill, but without premeditation and deliberation — the trial court, on its own initiative, should also have instructed on a second type of second degree murder — an unlawful killing with implied malice. They point out that second degree murder is a lesser offense necessarily included within the crime of murder, and that a trial court's obligation to instruct on lesser included offenses includes the duty to instruct on every form of the lesser included offense that is supported by substantial evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 162 ["a trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence"].) Here, they argue, there was substantial evidence that they unlawfully killed victims Robinson and Fuller while acting with implied malice, and the trial court therefore erred by failing to instruct on this type of second degree murder.

We find no error. When a defendant is charged with murder and the prosecution proceeds on the theory that the killing was an intentional,

61

premeditated killing, the trial court must instruct on an implied malice theory of second degree murder only if the record contains evidence from which a reasonable jury could conclude that the defendant killed *without* express malice, but *with* implied malice. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1233.) Here, the record contained no such evidence. The prosecution presented strong evidence that both defendants acted with intent to kill, and therefore with express malice: The victims were shot with armor-piercing shells fired from an assault-type rifle, each victim was hit multiple times (although one shot may have hit both victims), and each defendant made a statement after the murders that implied he had acted with intent to kill. (See pt. II.B.7., *ante*.) Neither defendant presented evidence that he acted with implied malice or any less culpable mental state; instead, each presented evidence tending to show that he did not participate in the murders. (See pt. I.A.2., *ante*.) Thus, the evidence showed that each defendant was guilty of murder with express malice or not guilty at all, and the trial court therefore had no duty to instruct on an implied malice theory of second degree murder.

Both defendants here argue that in not instructing the jury on second degree murder resulting from an unlawful killing by implied malice, the trial court violated their right to due process under the federal Constitution's Fourteenth Amendment by forcing the jury to make an "all or nothing" choice between first degree murder and acquittal. (See *Beck v. Alabama* (1980) 447 U.S. 625, 637; *People v. Benavides* (2005) 35 Cal.4th 69, 103.) Not so. The jury was instructed on another form of second degree murder — second degree murder resulting from an unlawful killing by a perpetrator acting with intent to kill — and accordingly did not have an all-or-nothing choice in evaluating defendants' culpability. (See *Schad v. Arizona* (1991) 501 U.S. 624, 646-648 [second degree murder instruction sufficient to ensure verdict's reliability]; *Benavides*, at p. 103.)

### 9. *Refusal to give proposed defense instruction*

Defendants argue that the trial court erred by not instructing the jury: "Merely being in the company of a person believed to have committed a felony is not sufficient to sustain a guilty verdict." We find no error. Declining defendants' request to give this instruction, the trial court instead instructed the jury that "[m]ere presence at the scene of the crime which does not itself assist the commission of the crime does not amount to aiding and abetting," and that "[m]ere knowledge . . . that a crime is being committed and a failure to prevent it does not . . . amount to aiding and abetting." This instruction conveyed the essence of the instruction proposed by defendants.

### 10. *Failure to give limiting instruction*

The trial court instructed the jury: "If you find that a defendant attempted to or did persuade a witness to testify falsely or attempted to or did fabricate evidence to be produced at the trial, that conduct may be considered by you as a circumstance tending to show a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt and its weight and significance, if any, are for you to decide." (See CALJIC No. 2.04.) It also instructed: "If you find that an[] effort to procure false or fabricated evidence was made by another person for the defendant's benefit, you may not consider that effort as tending to show[] the defendant's consciousness of guilt unless you also find that the defendant authorized that effort. If you find defendant authorized the effort, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide." (See CALJIC No. 2.05.)

Defendant Satele objected to both instructions. Contending that the prosecution had presented no evidence that he had tried to persuade a witness to testify falsely or to fabricate evidence, he asked the trial court to modify CALJIC No. 2.04 to state that it applied only to codefendant Nunez. The court refused.

63

Defendant Satele contends that the trial court erred by giving the two instructions without the modification he requested.  We disagree.  The first instruction merely told the jury that if it found that either defendant had tried, successfully or unsuccessfully, to persuade a witness to testify falsely, or had tried to fabricate evidence to be produced at trial, such conduct could indicate consciousness of guilt but was itself insufficient to prove guilt, and the jury was "to determine the weight and significance assigned to such behavior."  (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224.)  Similarly, the second instruction explained that the jury could not consider a third party's efforts to procure false evidence as indicating a defendant's consciousness of guilt unless the jury also found that the defendant had authorized that effort; it also clarified that such authorization was insufficient to prove a defendant's guilt, but the jury was to determine the weight and significance of the evidence.  These instructions told the jury to infer that a particular defendant had a consciousness of guilt only if that defendant had engaged in the described conduct.  Thus, if — as defendant Satele contends — the prosecution presented no evidence that he tried to procure false testimony or to fabricate evidence, and no evidence that he authorized anyone else to do so, we presume that the jury concluded that the instructions did not apply to him and it should not infer a consciousness of his guilt.  (See *Jackson*, at p. 1225 [" '[A]t worst, there was no evidence to support the instruction and . . . it was superfluous.' "].)

> 11. *Error in allowing jury to make special circumstance findings as to each count*

Defendants contend that the trial court erred in allowing the jury to make multiple-murder special-circumstance findings as to each count of murder.  (§ 190.2, subd. (a)(3).)  The Attorney General concedes the error.  We agree, and

vacate one multiple-murder special-circumstance finding for each defendant. (*Hardy*, *supra*, 2 Cal.4th at pp. 191, 216.)

### 12. *Effect of erroneous guilt phase instructions and duplicative multiple-murder special-circumstance findings on judgments of death*

Defendants assert that the duplicative multiple-murder special-circumstance findings, considered in conjunction with the trial court's instructional errors pertaining to the gang enhancement (see part II.B.4., *ante*), the firearm use enhancement (see part II.B.5., *ante*), and the multiple-murder special-circumstance allegations (see part II.B.7., *ante*), affected the jury's penalty phase deliberations, requiring reversal of the judgment of death. We disagree. These errors had no effect on the admissibility of any evidence presented to the jury at either the guilt or the penalty phase of trial, and hence do not require reversal of the judgment of death. (See *Brown v. Sanders* (2006) 546 U.S. 212, 223-224; *People v. Bonilla* (2007) 41 Cal.4th 313, 334 [second special circumstance "was superfluous for purposes of death eligibility and did not alter the universe of facts and circumstances to which the jury could accord . . . weight"]; *People v. Marshall* (1996) 13 Cal.4th 799, 855 ["the jury's consideration of duplicative multiple-murder special circumstances is harmless where, as here, the jury knows the number of murders on which the special circumstances are based"].)

### 13. *Jury's alleged failure to find degree of crimes charged in murder counts 1 and 2*

Defendants contend that the jury failed to find the degree of the murders, and that by operation of section 1157, both murders are therefore of the second degree. We disagree.

Section 1157 provides: "Whenever a defendant is convicted of a crime or attempt to commit a crime which is distinguished into degrees, the jury . . . must

find the degree of the crime or attempted crime of which he is guilty. Upon the failure of the jury . . . to so determine, the degree of the crime or attempted crime of which the defendant is guilty, shall be deemed to be of the lesser degree." Here, the jury's signed verdict forms found defendants "guilty of the crime of willful, deliberate, premeditated murder, in violation of section 187(a) of the Penal Code" as to each charge of murder. Because each of these findings is equivalent to a finding of first degree murder, section 1157 is not implicated. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 635 (*San Nicolas*) [holding that a signed verdict form similar to the one used here was tantamount to a finding of first degree murder].) We reject defendant Satele's invitation to revisit our conclusion in *San Nicolas.*

We further reject defendant Satele's contention that our reliance on *San Nicolas*, *supra*, 34 Cal.4th at page 635, violates his right "to due process of law . . . and to be free of ex post facto application of the laws" because we decided *San Nicolas* after he committed the murders. Because Satele challenges our retroactive application of a judicial decision construing section 1157 and does not challenge section 1157 itself, his claim is more properly characterized as invoking due process, not the ex post facto clause. (*People v. Brown* (2004) 33 Cal.4th 382, 394.) In any event, application of our holding in *San Nicolas* to this case does not violate Satele's rights under either provision because that holding did not attach criminality to a prior act that was innocent when done, impose a greater punishment for a crime than was prescribed at the time of its commission, or alter the degree or measure of proof necessary to convict from that which was required at the time a crime was committed. (*Brown*, at p. 394.)

Defendant Satele summarily asserts that application of our holding in *San Nicolas*, *supra*, 34 Cal.4th at page 635, to his case violates his right to equal protection of the law. He offers no argument and cites no authority, however, in

support of this claim, which we therefore reject.  (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 [reviewing court need not consider claim that is accompanied by neither argument nor authority].)

### 14. *Claim that guilt and penalty verdicts were returned by a jury of fewer than 12 sworn jurors*

After 12 trial jurors were selected by the parties, the trial court administered this statutorily required oath (Code Civ. Proc., § 232, subd. (b)):  "You, and each of you, do understand and agree that you will well and truly try the cause now pending before this court and render a true verdict according to the evidence presented to you and the instructions of this court?"  The jurors collectively responded, "I will."  Shortly thereafter, six alternate jurors were selected, and the court inquired:  "You understand and agree that you will act as an alternate juror in the case now pending before this court by listening to the evidence and instructions of this court, and will act as a trial juror when called upon to do so?"  The alternate jurors collectively responded, "I will."  The jurors and alternate jurors were then excused for the weekend, after which several persons, including Juror No. 5, spoke to the court and counsel privately.

The next Monday, the trial court excused Juror No. 5 for cause, and replaced her with an alternate.  The court then read the amended information, and told the jury:  "Members and alternate members of the jury, you have been selected and sworn as jurors and alternate jurors.  I shall now instruct you as to your basic functions, duty and conduct.  At the conclusion of the case I will give you further instructions on the law. . . .  You must base the decision you make on the facts and the law.  First, you must determine the facts from the evidence received in the trial and not from any other source.  A 'fact' is something proved by the evidence or by stipulation. . . .  Second, you must apply the law that I state to you to the facts as

you determine them, and in this way arrive at your verdict and any findings you are instructed to include in your verdict."

During the jury's penalty phase deliberations, the trial court replaced Jurors Nos. 9 and 10 with alternate jurors. At no time did the court administer to the three alternate jurors who replaced Jurors Nos. 5, 9, and 10 the oath described in Code of Civil Procedure section 232's subdivision (b), which it had administered at the beginning of trial to the other sitting jurors.

Both defendants argue that the guilt and penalty verdicts were returned by a jury of fewer than 12 sworn jurors, because the three alternates who served on the jury were never properly sworn as they did not take the same oath given to the jurors already selected. Defendants rely on section 1089 and Code of Civil Procedure section 234, each of which provides in relevant part, "The alternate jurors shall be seated so as to have equal power and facilities for seeing and hearing the proceedings in the case, and shall take the *same oath as the jurors already selected . . . .*" (Italics added.)

We agree with defendants that the trial court erred in failing to administer the proper oath to the alternate jurors when they were sworn, but we conclude there was no prejudice. In the presence of the prospective jurors later chosen as alternate jurors, the trial court administered the oath required by Code of Civil Procedure section 232's subdivision (b) to the jurors who had been selected to decide the case. A short time later, the alternate jurors took an oath that each of them would "act as an alternate juror in the case now pending before this court by listening to the evidence and instructions of this court, and . . . act as a trial juror when called upon to do so." Because the alternates had heard the oath taken by the 12 jurors selected to try the case, they were aware that to "act as a trial juror when called upon to do so" meant that they must comply with the oath set forth in Code of Civil Procedure section 232's subdivision (b) — that is, to "try the cause

68

now pending before this court and render a true verdict according only to the evidence presented to you and the instructions of this court." The trial court emphasized these principles in the opening instructions given to both the jurors and the alternates, explaining that the jury must reach its verdict by determining the facts from "the evidence received in the trial and not from any other source," and by applying the law as stated by the court to those facts. The error was therefore harmless. (See *People v. Carter* (2005) 36 Cal.4th 1114, 1175-1176 [concluding there was no prejudice when the trial court erroneously failed to administer the oath of truthfulness to certain prospective jurors before voir dire]; *People v. Lewis* (2001) 25 Cal.4th 610, 630.)

### C. Penalty Phase Issues

#### 1. Discharge of Juror No. 10

##### a. Factual background

On Thursday, June 29, 2000, during the jury's penalty phase deliberations, the trial court received this note from the jury: "We are at an impasse on the verdict 10-2, what and how do we go on? Need answer ASAP." About 35 minutes later, Juror No. 6, the foreperson, wrote the court another note saying: "Jury member #10 . . . stated that she had confided with her friend and mother and that they sided with her doubts — Possibly replacing her would be appropriate." The next day, the court and counsel spoke with Juror No. 6. The court read the notes from the day before out loud and asked Juror No. 6, "[W]hen did you discover that [Juror No. 10] had been talking to her mom?" Juror No. 6 replied, "She admitted [it] to us right at the table."

The trial court and counsel then questioned Juror No. 10, who said that after the guilt phase deliberations she had "confided with [her] friend and mother about issues relating to this case." The court asked whether the discussions happened in

69

the penalty phase, and Juror No. 10 said, "No." The court asked, "As you were deliberating?" Juror No. 10 replied, "No, it was after. It was the day that I turned it in, and it didn't sit right with me." The court then said: "I just want to make sure that because the jury's still what we call live and deliberating, I don't want you to disclose anything relating to the deliberation process unless I instruct you to do so." The court asked if Juror No. 10 remembered when she had spoken to her mother and to her friend. Juror No. 10 said that the conversations occurred two days earlier on Wednesday evening, and lasted about five minutes with her friend, and about a minute or two with her mother.

The court asked Juror No. 10 if she had described to her mother the vote she anticipated casting on the question of penalty. Juror No. 10 said she had not told her mother, but as to her friend, she "would have to say yes." The court asked if Juror No. 10 had told her friend "what you're thinking about making —" Juror No. 10 interrupted and said: "No, no, no, no, no. We had already reached the verdict. Wednesday night we had reached the verdict." The court said: "Obviously, there's no verdict because at this point in time there is no verdict reached. So you're still deliberating, in other words?" Juror No. 10 replied, "Yes." The court said: "You're still going through the process, and Thursday you were going through the process as you were on Wednesday, and today you're going through the process, right?" Juror No. 10 replied, "Yes."

Juror No. 10 said her friend had come over to see her on Wednesday night. She explained: "[The friend] saw that I was upset, and she asked me how was the case going. I said oh, it's over with, you know. We're going to turn in the verdict in the morning, and she said okay, well, you know, that's really good; and I said, well, you know, I guess it is. It just all depends on how you look at it; and she says as long as it sits right with you, that's all that matters; and from there — it wasn't sitting right already when I got home." Juror No. 10 did not tell her friend

70

"what was not sitting right." The friend asked what the jury had decided. When Juror No. 10 said she could not discuss it, the friend asked, " 'well did you go . . .,' " and made gestures. (The record does not describe the gestures, but we infer from the testimony that she made "thumbs up" and "thumbs down" motions.) The trial court asked Juror No. 10, "One way or the other?" Juror No. 10 responded: "And when she went like this here (gesturing) and I just said yeah, to the one, and she just said, 'hmm, interesting,' " and made a statement relating to views on the death penalty.

Also on Wednesday evening Juror No. 10 received a call from her mother. At the end of the conversation, her mother asked, " 'So how is your case going?' " Juror No. 10 said, "You know what, it's done," and her mother said, " 'Well, good.' " Her mother then mentioned a political topic, and Juror No. 10 said, "Well . . . that has nothing to do with me . . . . I have some issues and some stuff that I have to work out." Her mother replied, " 'Well, just pray.' " Juror No. 10 did not describe to her mother the "issues" she had to "work out."

The prosecutor asked the trial court to excuse Juror No. 10. Defendant Nunez's counsel asked the court to determine whether the jury had reached a verdict on Wednesday night; he asserted that if a verdict had been reached, there was no reason to excuse the juror. Defendant Satele's counsel also wanted to know "what was done Wednesday night," and whether the court and counsel were "under a misguided belief that they were deliberating yesterday."

The trial court found that Juror No. 10 had committed misconduct and discharged her. The court explained: "The fact that the juror maybe believed that there is a verdict, it is actually a taking of a vote. Jurors take several votes and continue deliberating. The only time that they have a verdict is when they sign the verdict form. The fact that they may have taken a vote, even if they're at an impasse, [does] not mean there was a verdict. . . . [T]he only thing that she

71

disclosed to the jurors, as I understand from her statement, is that she said she confided in her mother and a friend. . . . [T]his court finds based upon the juror's demeanor, and also based upon the juror's comments, that there is misconduct on the juror's part . . . [and] grounds for substituting an alternate."

### b. Analysis

Section 1089 "authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is 'found to be unable to perform his or her duty.' " (*People v. Bennett* (2009) 45 Cal.4th 577, 621 (*Bennett*).) Whether to remove the juror is left to the discretion of the trial court, whose decision for removal is reviewed by "asking whether the grounds for such removal appear in the record as a demonstrable reality." (*People v. Thompson* (2010) 49 Cal.4th 79, 137 (*Thompson*).)

Here, Juror No. 10 admitted telling her close friend that the jury would return a verdict the next morning, the nature of that verdict, and her unease with the verdict, thus violating the court's admonition not to discuss the case with anyone outside the jury room. This was misconduct. (*People v. Ledesma* (2006) 39 Cal.4th 641, 743 (*Ledesma*) [juror who discussed the case with his wife committed deliberate misconduct].) After the juror's statements, the friend expressed her views on the death penalty, the very decision the juror had to make in the case. (See *People v. Danks* (2004) 32 Cal.4th 269, 309 (*Danks*) [juror who asked "her pastor about the Bible's stand on the very issue she was deliberating" committed misconduct].) A "judge may reasonably conclude that a juror who has violated instructions to refrain from discussing the case . . . cannot be counted on to follow instructions in the future" and is unable to perform her duty as a juror. (*People v. Daniels* (1991) 52 Cal.3d 815, 865.) For these reasons, the trial court had good cause to discharge Juror No. 10.

## 2. Discharge of Juror No. 9

### a. Factual background

On June 20, 2000, during the evidentiary portion of the penalty phase, Juror No. 9 telephoned the trial court that she was two months pregnant, had a medical emergency, and was on her way to the hospital. Later that day, the court received a note from Juror No. 9's physician stating that the juror was in severe pain with a hemorrhagic cyst of the right ovary, that she had been prescribed bed rest, and that she would be unable to participate in jury duty for the next 48 to 72 hours. That afternoon, the court and counsel spoke with Juror No. 9's doctor. In the physician's view, the juror would recover within 72 hours and could then return to jury duty. The court then declared a recess until that time.

On July 3, 2000, during penalty phase deliberations, the trial court read to counsel a note from Juror No. 9 that was dated July 2 (a Sunday). The note stated: "Your Honor, [¶] Respectfully, I am asking if I may be removed from this case. I feel the high amount of stress this case created will be detrimental to the health of my unborn child, as well as toward myself. Because I am considered high risk in this pregnancy, I want to make sure I do everything possible to increase my chances of being able to carry this baby full term. [¶] I wish to thank you for your time, effort, and compassion in the rendering of your decision." The court asked counsel whether it should inquire into the matter. The prosecutor favored an inquiry. Counsel for both defendants, however, objected to any inquiry into Juror No. 9's ability to continue to serve because of her health.

The trial court and counsel then talked to Juror No. 9. She confirmed sending the note, and said she was three months pregnant. The court asked her why she considered the case as potentially detrimental to her health. Juror No. 9 explained that two years before the trial she had had a miscarriage when she was five months pregnant, at a time when she was under a lot of stress at work. When

73

the court asked whether continued participation in deliberations would cause her stress, Juror No. 9 replied, "Yes, sir." To the court's inquiry whether it had "caused a great amount of stress," Juror No. 9 replied, "Yes, especially Friday." The court asked, "Do you believe that it would be in your best interests and the best interests of your unborn child if you are excused from this case?" Juror No. 9 said, "Yes, sir." The court asked: "Based on your . . . health and your health history — would it . . . be your opinion that you would be unable to discharge and perform your duty any further in this case and continue deliberating?" Juror No. 9 replied, "Yes, sir."

Defendant Nunez's counsel asked Juror No. 9, "What happened on Friday?" She replied, "Friday is when I began to feel the pains that I have felt in the past." Nunez's counsel asked Juror No. 9 if she had "seen a doctor since Friday?" She said: "I was trying to get in to see a doctor Friday afternoon and was unable to. So if I can today, I'm going to try to get in to see a doctor."

After hearing argument, the court ruled: "The court finds good cause to excuse Juror No. 9. . . . [T]his court finds that this juror's unable to perform her duty; and given that she . . . two years ago lost a child at five months because of stress at work, and given the stress that this case has caused upon her throughout this trial — she has suffered one hemorrhage, and now she is having pains again starting Friday — to ask her to continue on to endanger her life and also the life of her unborn child, if that is the ultimate risk . . . would be a high price to pay for jury duty. . . . [T]he court finds good cause that this juror is unable to perform the juror's duty because she's sick." It then discharged Juror No. 9.

### b.	Analysis

Defendants fault the trial court for discharging Juror No. 9 for cause. We perceive no error.

74

As noted above in part II.C.1.b., section 1089 "authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is 'found to be unable to perform his or her duty.' " (*Bennett*, *supra*, 45 Cal.4th at p. 621.) "Removal of a juror under section 1089 is committed to the discretion of the trial court, and we review such decisions by asking whether the grounds for such removal appear in the record as a demonstrable reality." (*Thompson*, *supra*, 49 Cal.4th at p. 137.) Defendants contend the record here shows no such demonstrable reality because Juror No. 9 did not persist in her efforts to see a doctor about her condition, and because the trial court did not speak to Juror No. 9's doctor about the pain she was feeling. They note that previously, when Juror No. 9 was forced to temporarily suspend her jury service because of severe pain, her doctor had attributed the pain to a cyst, not stress, and had told the court that Juror No. 9 could resume jury service after three days of rest.

Juror No. 9 had a high-risk pregnancy and was experiencing pain, and earlier in the penalty phase she had experienced hemorrhaging that caused her doctor to order her to go on bed rest and suspend her jury service for three days. She felt stress from the jury deliberations, and a previous pregnancy had ended in a miscarriage that occurred when she was under stress. Based on these circumstances, the trial court had ample reason to discharge Juror No. 9. (See *Thompson*, *supra*, 49 Cal.4th at p. 138 [trial-related stress can provide good cause for discharging a juror]; *People v. Collins* (1976) 17 Cal.3d 687, 690-691, 696 (*Collins*) [juror properly discharged because of inability to cope with the experience of being a juror]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1099-1100 [juror properly discharged because of anxiety about new job].)

75

### 3. Failure to instruct jury to begin deliberations anew

#### a. Factual background

When the trial court first learned that Juror No. 9 was ill and might be unable to return to jury service, it told the parties it was considering instructing the jury with CALJIC No. 17.51, which directs the jury, following the replacement of a juror with an alternate during deliberations, to "set aside and disregard all past deliberations and begin deliberating anew." But when the court replaced Juror No. 10 with Alternate Juror No. 2, it instead instructed the jury, without objection, solely in the language of CALJIC No. 17.51.1: "Members of the jury, a juror has been replaced by an alternate juror. The alternate juror was present during the presentation of all the evidence, arguments of counsel, and reading of instructions during the guilt phase of the trial. However, the alternate juror did not participate in the jury deliberations which resulted in the verdicts and findings returned by you to this point. For the purposes of this penalty phase of the trial, the alternate juror must accept as having been proved beyond a reasonable doubt those guilty verdicts and true findings rendered by the jury in the guilt phase of this trial. Your function now is to determine along with the other jurors, in the light of the prior verdict or verdicts and findings and the evidence and law, what penalty should be imposed. Each of you must participate fully in the deliberations, including any review as may be necessary of the evidence presented in the guilt phase of the trial." The court did not give CALJIC No. 17.51.

When the trial court later replaced Juror No. 9 with Alternate Juror No. 4, it again gave CALJIC No. 17.51.1, but not CALJIC No. 17.51. As before, there was no objection. The record contains no explanation for the court's failure to give CALJIC No. 17.51.

After Juror No. 9 was replaced, the jury deliberated for about 50 minutes before reaching a verdict of death as to both defendants.

76

### b. *Analysis*

Defendants contend that after replacing Jurors Nos. 9 and 10, the trial court erred in failing to instruct the jury to disregard its previous penalty deliberations and to begin deliberating anew. (See CALJIC No. 17.51.) They rely on *Collins*, *supra*, 17 Cal.3d 687.

In *Collins*, which was not a death penalty case, we held that "substitution of an alternate for an original juror is constitutionally permissible after deliberations have begun" when "good cause has been shown and the jury has been instructed to begin deliberations anew." (*Collins*, *supra*, 17 Cal.3d at p. 691.) We observed: "The requirement that 12 persons reach a unanimous verdict is not met unless those 12 reach their consensus through deliberations which are the common experience of all of them. It is not enough that 12 jurors reach a unanimous verdict if 1 juror has not had the benefit of the deliberations of the other 11. Deliberations provide the jury with the opportunity to review the evidence in light of the perception and memory of each member. Equally important in shaping a member's viewpoint are the personal reactions and interactions as any individual juror attempts to persuade others to accept his or her viewpoint. The result is a balance easily upset if a new juror enters the decision-making process after the 11 others have commenced deliberations. The elements of number and unanimity combine to form an essential element of unity in the verdict. By this we mean that a defendant may not be convicted except by 12 jurors who have heard all the evidence and argument and who together have deliberated to unanimity." (*Id*. at p. 693.) We therefore construed section 1089, which authorizes trial courts to replace a sitting juror with an alternate, as requiring any court making such a replacement to "instruct the jury to set aside and disregard all past deliberations and begin deliberating anew." (*Collins*, at p. 694.) But we held that the trial

77

court's erroneous failure to give such an instruction in *Collins* was harmless under state law. (*Id*. at p. 697.)

In *People v. Fields* (1983) 35 Cal.3d 329 (*Fields*), a capital case, the defendant argued that the trial court violated his right to a jury that was a representative cross-section of the community at the *guilt* phase of trial by excusing for cause prospective jurors whose views about the death penalty made them unable to sit as jurors at the *penalty* phase. In explaining why his claim lacked merit, we discussed why such jurors could not routinely be allowed to serve on the jury during the guilt phase, and replaced with alternates for the penalty phase. (*Id*. at p. 351, fn. 9.) We observed: "[A]n alternate joining the jury after it had deliberated on the issues of guilt and special circumstances and reached a verdict . . . would be joining a group which has already discussed and evaluated the circumstances of the crime, the capacity of the defendant, and other issues which bear both on guilt and on penalty. The resulting deliberations between old members who have already considered the evidence and may have arrived at tentative conclusions on some aspects of the case, and new members ignorant of those discussions and conclusions, would depart from the requirement that jurors 'reach their consensus through deliberations which are the common experience of all of them' " (*Id*. at p. 351, quoting *Collins*, *supra*, 17 Cal.3d at p. 693.)

Despite this language in *Fields*, *supra*, 35 Cal.3d at page 351, we have repeatedly held that a trial court need not give an instruction based on *Collins*, *supra*, 17 Cal.3d 687, when an alternate juror is substituted at the penalty phase *before* deliberations begin. (See, e.g., *People v. Ashmus* (1991) 54 Cal.3d 932, 1005.) But here, the jury's penalty phase deliberations had already begun when Juror Nos. 9 and 10 were discharged; hence the instruction was required. (See *Ledesma*, *supra*, 39 Cal.4th at p. 743 [discharge of juror after penalty deliberations

78

had begun did not require discharge of the entire jury because the court instructed the jury to disregard their past deliberations and begin deliberations anew].)

We therefore consider whether the trial court's error in not instructing the jury to set aside its previous deliberations and begin anew was prejudicial. Both defendants contend this error violated their rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. In *Collins*, *supra*, 17 Cal.3d at page 697, footnote 5, we held that such an error does not violate the federal Constitution when it occurs at the guilt phase; here defendants offer no persuasive argument why the result should be different when the error occurs at the penalty phase. Therefore, our prejudice assessment applies the test for state law error at the penalty phase of trial: Is there a "reasonable possibility" that the error affected the jury's penalty verdict? (*People v. Fuiava* (2012) 53 Cal.4th 622, 719.)

In assessing prejudice, we note that each time the trial court replaced a sitting juror with an alternate, it explained: "Your function now is to determine along with the other jurors, . . . what penalty should be imposed. Each of you must participate fully in the deliberations, including any review as may be necessary of the evidence presented in the guilt phase of the trial." Although this instruction did not *expressly* state that deliberations were to begin anew, its comment that each juror must "participate fully in the deliberations" implied that this was the case. (See *People v. Cain* (1995) 10 Cal.4th 1, 66 [such language did not "suggest the substituted juror should play less than an equal role" in reviewing the guilt phase evidence to assess the circumstances of the crime and the existence of lingering doubt].)

Furthermore, the *Collins* instruction plays a more limited role at the penalty phase of trial than at the guilt phase. "Unlike the guilt determination, 'the sentencing function is inherently moral and normative, not factual.' " (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79.) Thus, a penalty phase juror properly

79

considers "personal religious, philosophical, or secular normative values" in making a penalty determination. (*Danks*, *supra*, 32 Cal.4th at p. 311; *People v. Lewis* (2001) 26 Cal.4th 334, 389-390 [jurors may rely " 'on their personal faith and deeply-held beliefs when facing the awesome decision of whether to impose the sentence of death on a fellow citizen' "].) The standard penalty phase instructions emphasize the personal nature of the penalty decision. Jurors are instructed, as they were in this case, that each juror is "free to assign [whatever] moral or sympathetic value" that juror deems "appropriate to each and all of the various factors" in aggravation and mitigation. (See CALJIC No. 8.88.) The jurors in this case were also instructed that they could "decide not to impose the penalty of death by granting the defendant mercy, regardless of whether or not [the defendant] deserves . . . sympathy."

Although a juror's view regarding the weight of a particular aggravating or mitigating factor, or the extension of mercy, may be informed by discussion with other jurors, ultimately it is a profoundly personal decision qualitatively different from the fact finding required by the jury in determining guilt for the charged offenses, which was the situation we confronted in *Collins*, *supra*, 17 Cal.3d 687. Moreover, unlike at the guilt phase, although a juror may be required to find some facts at the penalty phase, a juror can consider an aggravating factor even if other jurors do not agree it has been proven.

For these reasons — the language of the instruction given, and the normative context of the penalty phase deliberations — we conclude there was no reasonable possibility that the outcome of the penalty phase was affected by the trial court's failure to instruct the jury to set aside its prior deliberations when it replaced Jurors Nos. 9 and 10 with alternate jurors.

### 4. *Constitutionality of the death penalty statute*

Both defendants contend that the California death penalty law is unconstitutional, asserting various claims we have repeatedly rejected in the past.

Thus, we have said that "the California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court." (*People v. Dykes* (2009) 46 Cal.4th 731, 813 (*Dykes*).) We have further "reject[ed] the claim that section 190.3, factor (a), on its face or as interpreted and applied, permits arbitrary and capricious imposition of a sentence of death." (*Ibid.*; see *Tuilaepa v. California* (1994) 512 U.S. 967, 975-976, 978.)

Contrary to defendants' assertion, the death penalty statute contains adequate safeguards to avoid arbitrary and capricious sentencing and does not deprive defendants of the right to a jury trial, even though it does not require "unanimity as to the truth of aggravating circumstances, or findings beyond a reasonable doubt that an aggravating circumstance (other than section 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence." (*People v. Lynch* (2010) 50 Cal.4th 693, 766.) Nothing in *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, or *Apprendi v. New Jersey* (2000) 530 U.S. 466, affects our conclusions in this regard. (*People v. Dement* (2011) 53 Cal.4th 1, 55.)

The federal Constitution does not require the jury to make " 'written findings of the factors it finds in aggravation and mitigation.' " (*Dykes*, *supra*, 46 Cal.4th at p. 813.) At the penalty phase, the jury may properly consider a defendant's unadjudicated criminal activity. (*People v. Martinez* (2010) 47 Cal.4th 911, 968.) Use of the adjectives "extreme" and "substantial" in section 190.3, factors (d) and (g) is constitutional. (*People v. Valencia* (2008) 43 Cal.4th 268, 311.)

81

" ' "[T]he statutory instruction to the jury to consider 'whether or not' certain mitigating factors were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors. [Citations.]" ' " (*People v. Parson* (2008) 44 Cal.4th 332, 369.) Moreover, here the trial court instructed the jury: "The permissible aggravating factors are limited to those aggravating factors upon which you have been specifically instructed. Therefore, the evidence which has been presented by the defense regarding the defendant's background may only be considered by you as mitigating evidence."

Intercase proportionality review is not constitutionally required. (*People v. Stevens* (2007) 41 Cal.4th 182, 212 (*Stevens*); see *Pulley v. Harris* (1984) 465 U.S. 37, 50-51.) Moreover, "capital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws or due process of law." (*People v. Manriquez* (2005) 37 Cal.4th 547, 590.)

Both defendants contend that their death sentences violate international law. Here, there were no violations of state or federal law that preclude imposition of the death penalty in this case, and defendants "point[] to no authority that 'prohibit[s] a sentence of death rendered in accordance with state and federal constitutional and statutory requirements.' " (*Stevens*, *supra*, 41 Cal.4th at p. 213.)

    5.    *Asserted cumulative error*

Defendants contend that even if the errors at trial are not individually prejudicial, they were so prejudicial cumulatively that they require reversal of defendants' murder convictions and the judgments of death. We have concluded that the trial court committed instructional error pertaining to the street gang and firearm use enhancement allegations that requires vacation of those findings, and we have found that the duplicative multiple-murder special-circumstance findings

must be vacated.  We have also concluded that the court erred by failing to instruct the jury on the intent to kill requirement for the multiple-murder special-circumstance allegations when a defendant is an aider and abettor, by failing to administer the oath required by Code of Civil Procedure section 232's subdivision (b) to three jurors who were originally selected as alternates and later replaced sitting jurors, and by failing to instruct the jury in the language of CALJIC No. 17.51 upon replacing two jurors during the jury's penalty phase deliberations. These errors do not, whether considered individually or cumulatively, require reversal of either the murder convictions or the judgments of death.

## III.  DISPOSITION

As to both defendants, we vacate the true findings on the allegations pertaining to the street gang and firearm use enhancements, we vacate one multiple-murder special-circumstance finding for each defendant, and we otherwise affirm the judgments.


KENNARD, J.


WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Nunez & Satele

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S091915
**Date Filed:** July 1, 2013

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Thomson T. Ong

_____

**Counsel:**

Janyce Keiko Imata Blair, under appointment by the Supreme Court, for Defendant and Appellant David Nunez.

David H. Goodwin, under appointment by the Supreme Court, for Defendant and Appellant William Tupua Satele.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka and Lance E. Winters, Assistant Attorney General, Sharlene A. Honnaka, Jaime L. Fuster and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Janyce Keiko Imata Blair
321 Richmond Street
El Segundo, CA  90245
(310) 606-9262

David H. Goodwin
P.O. Box 93579
Los Angeles, CA  90093-0579
(323) 666-9960

Carl N. Henry
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2055